MAUD BATTISHILL V. SOLON HUMPHREYS ET AL., RE-
CEIVERS OF THE WABASH, ST. LOUIS &
PACIFIC RAILWAY COMPANY.

[See 64 Mich. 514.]

*Injury to infant—Imputed negligence of parent—Absence of flag-
man at railroad crossing—Manner of running train—Prac-
tice in circuit courts—Use of diagram by counsel.*

1. Plaintiff, a child of about three years of age, sued the defend-
ants for injuries received by being run over by one of defend-
ants' trains, and recovered a judgment, which was reversed,
MORSE, J. filing an opinion in which the doctrine of imputing
the negligence of parents to children of tender years, and of the
liability of such children as trespassers, is discussed, with
numerous citations of authorities, and favoring a reversal of the
judgment on the following grounds:

    *a*—The refusal of the court to instruct the jury that, upon the
testimony and under the pleadings, the absence of a flag-man at
the place of the accident was no evidence of negligence on the
part of defendants.

    *b*—The refusal of the court to instruct the jury that the fact
that the engine was backing, tender foremost, hauling the train
behind the engine, was no evidence of defendants' negligence.

    *c*—The refusal of the court to permit defendants' counsel, in
opening his case to the jury, to explain his proposed evidence by
a diagram of the premises where the accident occurred.

2. SHERWOOD, J., concurred in the *result* reached by MORSE, J.

3. CAMPBELL, C. J., and CHAMPLIN, J., concurred in granting a
new trial, but decline to discuss the question of imputed negli-
gence, it not being necessarily involved in the case.

Error to Wayne. (Jennison, J.) Argued October 12,
1886. Decided January 27, 1887.

Action on the case for negligence. Defendants bring error.
Reversed. The facts are stated in the opinion.

*Alfred Russell,* for appellants.

*Griffin & Warner,* for plaintiff.

[The points of counsel and the authorities are so thoroughly discussed in the opinion of Justice MORSE, that a summary of their briefs is omitted.—REPORTER.]

MORSE, J. This is an action for damages for personal injuries sustained by plaintiff, by reason of an accident to her, July 8, 1884, at Summit-avenue crossing, Springwells, near Detroit.

The Wabash, St. Louis & Pacific Railway was at this time operated by receivers, and the accident is charged to the negligence of their employés.

Plaintiff was a child about three years of age. Her father and mother lived on Ferdinand street, a block next west of Summit avenue, and were poor people. The father, at the time of the injury, was away at work, and the mother had gone down town for groceries. She left the child at home with her father, an old gentleman and an invalid. He was 79 years of age; and, when the mother went away, he was lying down in bed, and the child was in the room with him, playing with a kitten. The mother left the house at half past 2 P. M. and returned a quarter before 6. She testified that she expected the grandfather to look after the child. At the time of the trial the old man was at his son's residence in Kingsville, Canada, and was not a witness. The parents lived 150 feet from the railroad track south, on Ferdinand street or avenue.

The track of the railway of the defendants runs east and west across Ferdinand street, Summit avenue, and Clark avenue, as shown by the diagram on page 496.

The Fort Wayne & Elmwood Street Railway, upon which the child's father was a car conductor, ran along Clark avenue, crossing defendants' road. At this crossing a flagman or watchman was stationed by the railroad company. When he saw the train three miles away, it was his duty to stand on the crossing with his flag. He had a clear view

up to Summit avenue, and the train could be seen at a distance of two and one-half miles. There was no flag-man on Summit avenue, and no gate there. The child left the house, and went upon the track of the company, and was picked up, after the accident, at the spot indicated upon the diagram. Two witnesses, sworn on the part of the plaintiff, saw the accident.

Frank Brandt was unloading cinders from a car standing on a side track a little way from Clark avenue, about a block west of Summit avenue; was standing on the car. The train came from the west. He saw it when about half a block away from the child, who was on the track. She was run over. The cars did not stop after the accident. They were on the main track. The engine was backing, with the tender foremost. Five cars were attached. The engineer and fireman were on their seats as they passed. "The flag-man was standing on Clark avenue. He saw the child. He did not signal the train. The train was going about as fast as a horse could trot when I first saw it,—about five or six miles an hour. There was no bell rung or whistle blown at the crossing at Summit avenue, nor any signal given to the child that I heard. The first signal that I heard was when they whistled for Clark avenue, after the accident."

George Lewis, a boy 10 years old, was on the fence by Mr. Battishill's house; saw Maud first playing in the dirt in the road; saw her go on the track. He saw the train coming a block west from her, and ran to her, and tried to pull her off the track. She was trying to cross the culvert, going east. He got hold of her by the arms, but her stocking caught on the spikes. The train ran over her leg, cutting it off. She would have been killed had he not pulled her away. The train was going about as fast as witness could run.

Other testimony was given, on plaintiff's behalf, that the engine was backing towards the east, with the smoke-stack of the engine towards the cars; that no bell was rung or whistle blown until after the little girl was run over; then the whistle was blown for Clark avenue.

Thomas Melosh, the flag-man, was sworn on the part of the defendants, and testified that 15 or 20 minutes before the accident he saw the child, Maud, playing with other children upon the railroad track, within the inclosed premises of the

company, between Summit and Clark avenues; that he frightened them away, and they went across the commons towards Battishill's house. He further testified that he was stationed on Clark avenue to save accidents.

It was a pleasant day in July, and the sun was shining. Standing west of the crossing, with his flag in his hand, he has a clear view of either side of the railroad up to Summit avenue. "Can see every point on the road, and every point on either side of the road." He was asked, on cross-examination, the following question:

"Q. Did you say to Mr. Brandt, when the train was coming, and you saw the child upon the track, or looking in that direction, did Mr. Brandt ask you to wave your flag and check the train, and did you say: 'Damn the child,' or 'damn the children! let them get run over; I would not care if a hundred of them were run over?'

"A. If you want, I will ask you a good question on that what I have done."

This question was objected to by defendants' counsel on the ground that what he said or did would not bind the receivers; that it was irrelevant, immaterial, and incompetent; that it was no part of the *res gestæ*, and not connected with the accident in any way; it did not come under the plaintiff's declaration.

The court then said that he thought counsel was right upon that point, but he assumed, from the manner in which the question was put, that it was for the purpose of showing the witness' mind and feeling upon the subject and subject-matter upon which he had been testifying. He thought it competent for that purpose, as the witness' feeling might bear upon his credibility, but any such expression of his could not bind the company.

The counsel for plaintiff, Mr. Griffin, said:

"It affects his credibility entirely. Your honor stated the rule correctly, that his statement was not evidence, when we offered it as a part of our case; but if the witness made the

statement, then his whole testimony is injured. There is no doubt about that. If he made the statement, his whole testimony is untrue. It is for the purpose of showing that when he says that he did not see this child upon the track, and that she stumbled headlong and head-first in under a box car, it is for the purpose of showing that he not only saw her, but his attention was called to it, and he was asked to wave his flag, and he expressed himself in the way he did, indicating that he saw the child, but that he did not care enough about it to wave the flag."

*The Court.* "I think the question is competent."

Exception for defendants.

*Mr. Griffin.* "I will just modify the question a little by putting something in front of it. The question is withdrawn for the present.

" *Q.* Will you state whether Mr. Brandt called your attention to the child upon the track previous to the time the train reached it, and asked you to wave your flag and check the train, and did you say: ' Damn the child,' or ' damn the children! let them get run over; I wouldn't care if a hundred of them were run over?' "

*Mr. Russell.* " I object to that question upon this ground: because there is no allegation in the declaration that it was the duty,—that there is no statement in the declaration that the flag-man saw the train coming, that it was his duty,—to flag the train and stop it, and that he omitted to perform that duty. The question is whether or not he was requested to wave the flag, and whether or not he refused and said, ' Damn the children.' Your honor ruled in a case against the Flint & Pere Marquette Railway, and it was ruled by the Supreme-Court in the case of *Huntley v. Grand Rapids. & Ind.*, and in the case of *Stark v. Flint & Pere Marquette,* that it was necessary to set out in the declaration the particular duty and to negative the performance of the duty. My brother is trying to show that it was specially requested of this witness to stop that train by making a signal, and that he did not do it, and used opprobrious terms in refusing to do it, but he has not said a word in his declaration upon the subject. He has not advised us that he expected to show it, and I therefore object to it."

*The Court.* " You may put the question."

Exception for the defendants.

*Mr. Griffin.* " It has nothing to do with the *res gestæ* whatever; it bears upon this witness' credibility merely."

Question repeated.

"*A.* No, sir; not those words,—never those words went out of my head. No, sir."

Upon rebuttal the witness Brandt was recalled by the plaintiff, and asked the following question:

"*Q.* Mr. Brandt, did you call the attention of Mr. Melosh to the child upon the track, when the train was approaching it in an easterly direction, and did he say: 'Damn the kid; let her get run over; if a hundred of them would get run over, folks would learn to keep their children at home?'"

This was objected to by defendants' counsel upon the same grounds stated when such inquiry was made of Melosh, and for the additional reason that it was not a contradiction of that witness upon a material point.

The court replied to such objections that "it would not be evidence on the *res gestæ,* what that flag-man said, yet it was evidence as to the credibility," and permitted the question to be answered. The witness Brandt thereupon answered, "Yes."

The engineer testified, upon the part of the defendants, that he did not see the child, but could see as close to the tender as he could if the engine was running forward.

"At the rate we were going, when we got to Summit avenue, I might have stopped the train in going the length of the engine, tender, and five cars, if I had seen the child. * * * If we whistled 'Off brakes,' and the brakes were applied, at the rate we were going, and the engine was reversed, I suppose we could have stopped it in 10 feet."

The fireman gave evidence that the whistle was sounded sharply twice, 40 rods before reaching Summit avenue, and the bell rung continuously until the crossing was passed, and he did not see the child; knew nothing about the accident until he got back to Delray. Both brakemen were on top of the train. The train was running not to exceed four miles an hour. Saw the flag-man when the train passed Clark avenue. He said nothing.

Frank Bailey, brakeman, testifies that he was on the train,

forward, but did not see the child, and did not know anything about the accident until the train returned.

Robert Henderson was helping the brakeman that day. He testifies the whistle was blown 110 to 130 feet west of Summit avenue, and that there was a continuous ringing of the bell. He was on the top of a box car, next to the engine, at the time of passing Summit avenue. He swears that he had an unobstructed view, and could have seen the child, but did not see her. On cross-examination he said: "It is not my business to look out in any particular, but everywhere. It is not so much my duty to look out for the track as it is to see that the cars are in proper condition."

We have given in substance all the evidence necessary to notice in the discussion of the errors alleged.

The counsel for defendants asked the court to instruct the jury that the plaintiff could not recover, which request was refused. He also requested the court to give other charges to the jury, to the effect that, under the law, the absence of a flag-man at Summit avenue was no evidence of negligence on the part of the company, nor was the backing of the engine, tender foremost, hauling the train, any evidence of negligence; that there was no evidence of negligence in the case as respects a usual and proper lookout upon the train; that there was no evidence of the child being on a crossing when struck, and therefore the ringing of the bell or blowing of the whistle became unimportant, because these signals are only required at crossings, but the affirmative evidence that the bell was rung and the whistle sounded should overcome the negative testimony of witnesses in that respect. Which requests were refused, except as they were embraced in the general charge.

We now proceed to examine the alleged errors, as the plaintiff recovered a judgment in the court below in the sum of $4,000.

1. As to the admission of the remark alleged to have been

made by the watchman when his attention was directed to
the child.   The objections to this evidence are substantially
quoted in the language of Mr. Russell, stated upon the trial.
It is true, there is no allegation in the declaration alleging in
any way that the injury to the child was occasioned by the
negligence or wantonness of the watchman, and therefore
the conduct or language of this employé could not be relied
upon in this suit to prove negligence in the defendants.
*Marquette, H. & O. R. R. Co. v. Marcott,* 41 Mich. 433;
*Flint & P. M. Ry. Co. v. Stark,* 38 Id. 714.

But the evidence was not offered or received for any such
purpose.   Melosh was introduced as a witness, and sworn on
the behalf of the defendants, and testified substantially that
he did not see the child for 15 minutes before the accident,.
and that, about that number of minutes before the accident,.
he saw the child and others playing within the inclosed
ground of the company, between Summit and Clark avenues,.
and that he frightened them away, and that they went across
the commons towards the house of the child's father.   This.
testimony must have been offered to support the claim ad--
vanced upon the trial by defendants' counsel that, when the
train came along, the child was playing in the ditch beside
the track, where she could not be seen by the engineer or
brakemen upon the train, and suddenly jumped up on the
track, and was run over before she could be seen.   This.
watchman had an unobstructed view of the track and the.
sides of the track, and his direct evidence tended to show
that the child could not be seen in time to prevent the in-
jury.   To dispute this it was certainly proper to show that
the child was in plain sight, and that his attention was.
directed to her.

The remark made by him would not be proper in contra-
diction of the witness, but, in my opinion, it was competent.
as going to his credibility as a witness.   It was offered by
plaintiff's counsel and received by the court for that purpose,

and that purpose only. The court expressly stated that his language could not bind the company, and that it would only bear upon his credibility as a witness.

The *animus*, feeling, or interest of a witness can always be shown, and, if he denies such feeling or interest, he can be contradicted upon that point. *Threadgool v. Litogot*, 22 Mich. 271; *Geary v. People*, Id. 220; *Crippen v. People*, 8 Id. 117; *Beaubien v. Cicotte*, 12 Id. 459; *Patten v. People*, 18 Id. 314; *Hamilton v. People*, 29 Id. 173.

2. The counsel for the defendants contends that the case should have been taken from the jury principally for the reasons that the evidence shows the parents to have been negligent, and that the child was a trespasser upon the track.

In this case the child is suing by her next friend, and the question arises in such case whether the negligence of the parents, if admitted, can defeat her recovery. The question of their negligence in this case was submitted to the jury.

The question has never been directly adjudicated in this State.

It is held by the courts of some of the states, notably in Maine, Massachusetts, New York, and Indiana, that the negligence of the parents, when the child is of such tender years as to be incapable itself of such negligence, will preclude a recovery upon the part of the child suing by next friend. If the child be not able to judge for itself whether or not the place is one of danger, it is held to be the duty of its parents, or those having charge of the child, to judge for it; and, if they neglect this duty, their blame must be imputed to and suffered by the child. *Hartfield v. Roper*, 21 Wend. 615; *Mangam v. Brooklyn R. R. Co.*, 38 N. Y. 455; *Ihl v. Forty-second St. R. R. Co.*, 47 Id. 317, 323; *Holly v. Boston Gas Light Co.*, 8 Gray, 123, 132; *Wright v. Malden & M. R. R. Co.*, 4 Allen, 283; *Lynch v. Smith*, 104 Mass. 52; *Messenger v. Dennie*, 137 Id. 197; *Callahan v. Bean*, 9 Allen.

401; *Pittsburgh, Ft. W. & C. Ry. Co. v. Vining's Adm'r,* 27 Ind. 513; *Lafayette & I. R. R. Co. v. Huffman,* 28 Id. 287; *Jeffersonville, M. & I. R. R. Co. v. Bowen,* 40 Id. 545; Shear. & R. Neg. § 48; *Brown v. European & N. A. Ry. Co.,* 58 Me. 384; *Leslie v. Lewiston,* 62 Id. 468; *Ewen v. Chicago & N. W. Ry. Co.,* 38 Wis. 613, 628; *Toledo, W. & W. Ry. Co. v. Grable,* 88 Ill. 441.

The English courts also hold to the same doctrine. *Singleton v. Eastern C. Ry. Co.,* 7 C. B. (N. S.) 287; *Waite v. N. E. Ry. Co.,* El. B. & E. 719, 728; *Mangan v. Atterton,* L. R. 1 Exch. 239.

This proposition, that the negligence of the parents or guardian of a child in allowing such child to stray away or go out unattended, has been modified by the courts holding to this rule in a great many instances so as, in practice, greatly to reduce its mischief; some holding that the question of such negligence is always one for the jury to determine, and that no rule of law can be laid down which interferes with the jury judging each case on its own merits. *Mulligan v. Curtis,* 100 Mass. 512; *Lynch v. Smith,* 104 Id. 52; *Mangam v. Brooklyn R. R. Co.,* 38 N. Y. 455; *Karr v. Parks,* 40 Cal. 188, 193; *Schierhold v. N. Beach & M. R. R. Co.,* Id. 447.

The courts of many states reject the rule laid down in 21 Wend. 615, and followed by the courts of Maine and Massachusetts. It was early questioned by Justice Redfield, of Vermont, in the case of *Robinson v. Cone,* 22 Vt. 213, 224; who said:

" We are satisfied that, although a child or idiot or lunatic may, to some extent, have escaped into the highway through the fault or negligence of his keeper, and so be *improperly* there, yet, if he is hurt by the negligence of the defendant, he is not precluded from his redress."

Agnew, J., in a Pennsylvania case, says:

" The doctrine which imputes the negligence of the parent to the child in such a case as this is repulsive to our natural

instincts, and repugnant to the condition of that class of persons who have to maintain life by daily toil."

*Kay v. Pennsylvania R. R. Co.*, 65 Penn. St. 269; *North Penn. R. R. Co. v. Mahoney*, 57 Id. 187; *Philadelphia & R. R. R. Co. v. Spearen*, 47 Id. 300; *Daley v. Norwich & W. R. R. Co.*, 26 Conn. 598; *Boland v. Missouri R. R. Co.*, 36 Mo. 490; *Whirley v. Whiteman*, 1 Head, 620; *Bellefontaine & I. R. R. Co. v. Snyder*, 18 Ohio St. 399; *Govt. St. R. R. Co. v. Hanlon*, 53 Ala. 70; *Keffe v. Milwaukee & St. P. Ry. Co.*, 21 Minn. 207; *St. Paul v. Kuby*, 8 Id. 154; *Cleveland, C., C. & I. R. R. Co. v. Manson*, 30 Ohio St. 451, 470; *G., H., etc., Ry. Co. v. Moore*, 59 Tex. 64, 68; *Norfolk & P. R. R. Co. v. Ormsby*, 27 Gratt. (Va.) 455; *Huff v. Ames*, 16 Neb. 139; Whart. Neg. §§ 313, 314.

In this State the question has been brought before this Court in one or two cases, but has not been directly passed upon.

In *Powers v. Harlow*, 53 Mich. 507, COOLEY, C. J., says, at page 512:

"When the case was submitted to the jury, the circuit judge instructed them to return a verdict for the defendant. This he did upon the ground that it is the duty of parents to take care of their children, and to see that they do not commit trespass; and if they do not do that, but suffer the children to wander away upon other people's property, the children go there at their own risk, and the neglgience is contributory on the part of the parents in allowing them to wander where they have no right; and this negligence of the parents is, for the purposes of legal remedy, imputable to the children themselves. This instruction was probably given in reliance upon *Hargreaves v. Deacon*, 25 Mich. 1, which was such a case as the instruction supposed."

The learned judge then proceeds to show from the facts that the child was not a trespasser, and that no negligence could be imputed to the father or the child, and reverses the judgment.

The case came to this Court again, and is reported in the

57 Mich. 107. The case was tried in the circuit court for the county of Marquette, and judgment there rendered in favor of the plaintiff, and affirmed in this Court.

It was again contended on the trial in the circuit, and on argument in this Court, that the father of the plaintiff was grossly negligent in permitting the plaintiff, a boy of about eight years, to be about the shed where he, the father, knew dynamite and explosives were stored. The matter was not passed upon by this Court, as it was considered to be a question for the jury, whose finding could not be disturbed by us. A claim was made, however, further, that the plaintiff's mother, in his presence, made the statement that the boy had been frequently warned of the presence of the explosives, and told to let them alone. The plaintiff, at the time this remark of the mother was made, was under the influence of an anæsthetic, and the physician could not say that he was in a condition to understand what was going on. The circuit judge, on the trial below, ordered the statement of the mother to be stricken from the testimony.

Error was alleged upon this ruling, and it was argued in this Court that the mother, as well as the father, was the natural guardian of the boy, and that, as such guardian, she was chargeable with care of him, and her negligence was imputable to him. From this it was further claimed that her admissions were admissible against him to prove his or her fault.

Chief Justice COOLEY, in referring to this last contention, very clearly and pertinently disposed of it in the following language:

"No authority is cited to this, and we are aware of none. The natural guardian has no power to admit away the rights of the ward whose person is committed to his custody. He is guardian of the person only, having no control of any estate the ward may possess, and could not be given a control except on judicial proceedings, and after giving security for responsible care. This being so, it cannot be plausibly

claimed that by an irresponsible admission he may deprive his ward of important rights. A right of action is as much property as is a corporeal possession, and, in the case of a minor, is protected by law in the same way and under the same securities. The mother could not release it, even for full consideration and by the most formal instrument; much less, therefore, could she, by mere word of mouth, when not under oath, or otherwise chargeable with responsibility, destroy his right of action by her admissions. The circuit judge was therefore right in his ruling."

This argument of the learned judge seems to me to be irrefutable; and, if so, the query arises whether this same natural guardian can, by his conduct,—by his negligence, either voluntary or involuntary,—destroy a right of action which he cannot admit away by word of mouth or the most formal writing. It seems plain to me that he cannot, but I shall speak of this further on.

In the case of *Keyser v. Chicago & G. T. Ry. Co.*, 56 Mich. 559, the question of the parents' negligence was again brought to the attention of this Court. In the opinion filed in that case Justice SHERWOOD rejected the doctrine that the child, two and one half years old, could be a trespasser upon the railroad track to the extent of subjecting himself, without the right of redress, to the negligent acts or omissions of the defendant company, and said that the question of the parents' negligence was, under the circumstances, properly submitted to the jury.

It is also claimed that in two other cases this Court has, in effect, adopted the New York and Massachusetts rule as to the negligence of the parents being a bar to the right of action upon the part of the child. *Hargreaves v. Deacon*, 25 Mich. 1; *East Saginaw C. Ry. Co. v. Bohn*, 27 Id. 503.

I can find no shadow of authority for this claim, as regards the first-named case, as the negligence of the parents of the child is not even so much as mentioned in the opinion filed in that case. In the latter case the point was made by the defendant that the mother of the child was negligent to

such a degree as to preclude the recovery by the infant. It was simply held in that case in this Court that the mother, from the facts, could not be presumed to have been negligent. The question whether such negligence, if it had existed, would have prevented the right of action, was not passed upon except by inference.

It may be contended that these decisions of our Court, above referred to, have assumed, by inference at least, that the negligence of the parents would defeat an action in the name and right of the infant. Be this as it may, it has certainly been treated as a proper question for the jury to decide in most cases; and in this particular case I am satisfied, if the rule be as claimed, that there was no error in submitting the question to the jury.

But I am not content to let the question pass as a settled one in this State. At least, I am not willing to assent to the proposition that the negligence of any other person can become the contributory negligence of a plaintiff without his fault. It is settled, and must be so, that a child of tender years, of the age of this child in the case at bar, is not capable of fault or negligence in itself, and, if not, I fail to perceive how, by any course of reasoning, it can be made responsible for the fault of another, no matter whom it may be. I cannot better state my own convictions than to use the language of the Supreme Court of Ohio in *Bellefontaine & I. R. R. Co. v. Snyder*, 18 Ohio St. 408, where Welch, J., says as follows:

"It is well settled that an adult person capable of self-control cannot recover for injuries occasioned by negligence, where he has himself been guilty of negligence which contributed to the result. This rule of law is founded upon reason and considerations of justice and public policy, which it seems to us are wholly inapplicable to the case of an infant plaintiff. These reasons and considerations are: (1) The *mutuality* of the wrong, entitling *each* party alike, where both are injured, to his action against the other, if it entitles either; (2) the impolicy of allowing a party to recover for

*his own* wrong; and (3) the policy of making the *personal* *interests* of parties dependent upon *their own* prudence and care.

"All these are wanting in the case of an infant plaintiff. No action can be maintained against *him* for the negligence of his parent or custodian; and it is difficult to perceive what principle of public policy is to be subserved, or how it can be reconciled with justice to the infant, to make his personal rights dependent upon the good or bad conduct of *others.* It is the old doctrine of the father eating grapes, and the child's teeth being set on edge. The strong objection to it is its palpable injustice to the infant. Can it be true, and is such the law, that if only one party offends against an infant he has his action, but that if two offend against him their faults neutralize each other, and he is without remedy? His right is to have an action against both."

The contrary doctrine would abandon the young and helpless, whom the courts are bound to protect, to the not always tender mercies of parents and guardians, and to wanton ill treatment and injury, without hope of redress. Parents are oftentimes improvident and careless, without any wickedness of heart or evil intent, and guardians are apt to be more careless and negligent of their wards than parents are of their children. The incapacity of the child should not be made to expose it to hurt or death, without redress or remedy, because of the fault, wanton or careless, of its natural protectors. The law aims to guard and shield children of tender years from the abuse of parents as well as of strangers. Why, then, should the fault of the parent,—his wrong against the child,—if contributing to the wrong of a stranger, exonerate the latter?

Judge Cooley, in his work upon Torts, in a note to his discussion of this question, on page 682, says that it may be urged with some plausibility that the doctrine of the New York court—

"Is more likely to guard the interests of children and imbeciles than is the opposite. If a heartless parent may suffer a child to take his first lessons in walking in the crowded

streets of a city, and then, when he is injured or killed, as in all probability he would be, may recover for such injury or killing on the ground that the child himself is too young to be chargeable with negligence, there will not, perhaps, be wanting depraved custodians of children, unrestrained by any considerations of humanity, willing enough to count upon probable gains from such reckless conduct."

But this argument must be predicated upon rare exceptions to the general rule of human conduct, and presupposes cases where parents are willing to maim or murder their offspring from avaricious motives.    While such extreme and wicked cases may exist, they are, in this enlightened age, and in our civilization, of very rare occurrence, and it will not do to found the policy of our law upon them.    It is the child that is to be guarded and protected by the courts; and the care cannot be too tender, nor the means of defense against injury too effective.

There are a thousand cases of carelessness or heedlessness, without wantonness, to one of actual evil intent, and the policy of the law ought to be shaped as against the former. Therefore, if the injury is occasioned by the negligence of the defendant, if the child be injured when it ought not to have been if reasonable and proper means of precaution had been used, the negligence or fault of the parent or guardian ought not, in my opinion, to be taken into account.

If the father or other person be suing on his own account for damages to him, arising from loss of service, then the contributory negligence of the person so suing applies, as in other cases; but when the child brings the action, it should not be made responsible for another's fault beyond its consent or control.    This little girl should not hobble upon crutches through life because its mother was inconsiderate and careless of its welfare and safety, if the employés of the defendants are blamable for the loss of its limb.

I agree with Justice SHERWOOD, in the case heretofore cited (*Keyser v. Chicago & G. T. Ry. Co.,* 56 Mich. 559),

that this child cannot be made or considered a trespasser upon the track of this railroad company. And the weight of authority elsewhere is decidedly against the position that a child of the age of this one can be a trespasser, so as to justify or excuse the negligence of the company, if such negligence is found. *Lynch v. Nurdin,* 1 Ad. & El. (N. S.) 29; *Sioux City & P. R. R. Co. v. Stout,* 17 Wall. 657; *Daley v. Norwich & W. R. R. Co.,* 26 Conn. 591; *Birge v. Gardiner,* 19 Id. 507; *Chicago & A. R. R. Co. v. Gregory,* 58 Ill. 226; *Kay v. Pennsylvania R. R. Co.,* 65 Penn. St. 269; *Bellefontaine & I. R. R. Co. v. Snyder,* 18 Ohio St. 399; *Isabel v. Hannibal & St. J. R. R. Co.,* 60 Mo. 475; *Keffe v. Milwaukee & St. P. Ry. Co.,* 21 Minn. 207; *Kansas C. Ry. Co. v. Fitzsimmons,* 22 Kan. 686.

A child of such a tender age as to be incapable of negligence cannot well become a trespasser. The circuit judge was right in instructing the jury that the little girl was not a trespasser.

3. I think the second request of the defendants should have been given, to wit:

"The railroad law of this State (art. 4, § 3) lays upon the Railroad Commissioner of the State the duty of determining the necessity of establishing a flag-man upon any particular street crossing of a railway; and upon the testimony and under the pleadings in this case, the absence of a flag-man at Summit avenue is no evidence of any negligence upon the part of the receivers."

No reference was made to this matter in the charge of the court; and it may well be considered, when a request is specifically made, and it is refused, that the jury will take such refusal as a liberty to infer that the request is wrong in law, unless some explanation is made by the court of the reasons for such refusal to rebut such natural inference. It is contended by the counsel for plaintiff that no claim of negligence on this account was made upon the trial; but evidence of this nature was introduced, and the request which

ought to have been given denied, and we cannot say it did not have some influence upon the jury in determining the question of the negligence of the company.

4. "The fact that the engine of the train was backing, tender foremost, hauling the train behind the engine, is no evidence of negligence upon the part of the defendants, and is not so charged in the declaration." This request was refused, and no reference made to it in the charge of the court. For the reasons given in reference to the third proposition, there was error in this refusal, as the charge was proper, and should have been given. The engine being reversed might call for greater vigilance upon the part of the train hands in looking out, but of itself was no evidence of negligence.

5. It is claimed that there was no evidence tending to show the want of a proper lookout upon the train. I think there was such evidence. It is true, the brakemen were on the top of the cars, and in a proper position as lookouts, but there is testimony tending to show that they did not look ahead for obstructions on the track, as they ought to have done. One of them testifies that he could have seen the child had he looked, but his business was more particularly to see if the cars kept in place. The others testify they did not see the child, but do not claim that they looked out for any one upon the track. It was especially the duty of the train hands, in passing over a street crossing where no flag-man was employed, to keep a vigilant lookout for persons or vehicles upon the track. There was an unobstructed view of this track for two miles before reaching Summit avenue, and from all the evidence in this record I cannot say that the jury were not warranted in finding negligence in this respect. Nor can the charge of the court be criticised as to this branch of the case.

6. I think there was evidence tending to show the child was on the crossing, though she was endeavoring, at the time of

the accident, to reach the premises of defendants by crawling across the cattle-guard or culvert.

7. The question of the weight of testimony as to the blowing of the whistle and ringing of the bell was for the jury, and properly submitted to them.

8. Upon the opening of defendants' counsel, after the plaintiff had rested, he attempted to explain the evidence that he should introduce in defendants' behalf by a diagram of the premises. He was not permitted to use this diagram by the court. We think he should have been allowed to do so.

I find no other error in the proceedings. Because of those noted above, a new trial must be granted, and the judgment below reversed, with costs.

SHERWOOD, J. I concur in the result.

CAMPBELL, C. J. I concur in granting a new trial. But I do not think the so-called discrediting testimony of the flag-man was competent. Had the case gone upon his negligence as a ground of action, it might have been competent impeaching testimony; but there can be no impeachment on irrelevant matters. The question of imputed negligence does not seem to me to be necessarily involved in the case, and I do not think it desirable to discuss its limitations.

CHAMPLIN, J., concurred with CAMPBELL, C. J.