PECK *v.* GRAND TRUNK WESTERN RAILWAY CO.

1. RAILROADS—CROSSINGS — NEGLIGENCE — CONTRIBUTORY NEGLI-
   GENCE.

   In an action for negligently causing the death of plaintiff's de-
   cedent at a crossing near a station at which a train then just
   past due was not scheduled to stop, it appeared that for a con-
   siderable distance in the direction from which the train was
   coming objects were plainly discernible; that the automatic
   electric bell was ringing; that the customary signals were
   given by the approaching train; and that defendant's station
   agent and others attempted to warn decedent before driving
   upon the track. *Held,* that decedent was guilty of contrib-
   utory negligence, and a verdict should have been directed for
   defendant.

2. SAME—CROSSINGS—FLAGS—FAILURE TO DISPLAY—EFFECT.

   In such action, the failure of the flagman at the crossing to use
   a white flag, as required by the rules of the company, would
   not excuse the contributory negligence of plaintiff's deced-
   ent, or amount to an invitation to him to go upon the track,
   in the absence of evidence that he knew of such requirement
   and relied upon it; it appearing that no flag had in fact ever
   been used.

Error to Genesee; Wisner, J. Submitted January 13,
1909. (Docket No. 78.) Decided February 2, 1909.

Case by Kate L. Peck, administratrix of the estate of
William A. Peck, deceased, against the Grand Trunk
Western Railway Company for the negligent killing of
plaintiff's intestate. There was judgment for plaintiff,
and defendant brings error. Reversed.

*Harrison Geer* and *William K. Williams,* for appel-
lant.

*Brown & Farley,* for appellee.

OSTRANDER, J. Plaintiff's intestate on April 9, 1906,

drove his horse upon the track of the defendant railroad company at Swartz Creek, in Genesee county, immediately in front of the west-bound fast passenger train, known as No. 3, which did not stop at that station, and was instantly killed.   The record presents two issues—one the negligence of the defendant; the other the contributory negligence of the decedent.   We give attention to the latter issue only, because we are satisfied that the decedent as matter of law was chargeable with negligence contributing to his injury.   The Grand Trunk Western Railway Company's tracks cross Mill street at Swartz Creek very nearly at right angles.   Substantially Mill street runs north and south, and the testimony of the county surveyor, undisputed, is that the angle made by the tracks with the street is one of about 70 degrees.   The train was due at Swartz Creek at 2:11 p. m.   It arrived at 2:15 p. m. Plaintiff, who lived south and east of Swartz Creek, who was about 34 years old, and, so far as appears, was physically normal, drove into the village in the morning with a single horse and an open buggy.   His movements in the village are traced in the testimony to and after the dinner hour and to and at the time when he procured his horse and wagon from the shed where they had been left and started to return to his home.   The facts concerning his journey from the village to the railroad crossing are practically undisputed.   From the platform of the railroad station, which is on the north side of the tracks, a train approaching from the east can be seen nearly a mile away. On the east side of Mill street, the first house north of the tracks is 85 feet distant from the tracks.   One going south and passing this house can see a man walking on the railroad tracks 612 feet east of the crossing.   At a point 75 feet north of the north rail, a person on the highway can see men walking on the track 1,175 feet east of the crossing.   At 50 feet north of the crossing one can see the white fence about half a mile east of the crossing.   From this point to the crossing the view to the east is practically unobstructed.   As decedent passed over the bridge some

60 rods north of the crossing, he encountered an acquaintance to whom he made salutation, and who said to him, "The fast train is coming," or, "Look out for the train," motioning in the direction from which it was coming. Witness had just heard the train whistle. The witness heard what decedent said. Whether decedent understood him no one can tell. At the time of the accident the electric automatic bell, stationed north and east of the crossing, was ringing from the time when the west-bound train appeared in sight until after the accident. The usual printed sign, asking travelers to stop, look, and listen, was fastened up on the north side of the railroad company's right of way. For a distance of 75 feet or more north of the track there was nothing to prevent one driving on the road from turning a horse to the west on practically level ground and driving up to the railroad station. The train approached at a speed of from 45 to 50 miles an hour and consisted of the locomotive and seven cars; two of the cars being Pullmans and one a dining car. Decedent drove towards the track at a rate of speed estimated by those who saw him as 10 miles an hour—"drove fast." If he had looked to the east at any time during the last 75 feet that he traveled, he must have seen the train. The train whistled for the crossing one-half mile east of the station. It also whistled for the station. A woman living 210 feet north of the crossing on the west side of Mill street saw decedent drive to the track, saw the train, heard its roar and whistle, heard the automatic bell ringing, although she was in her house with doors and windows closed. "Of course," she says in her testimony, "I was supposing he would stop every minute, but he did not."

The theory of the plaintiff is sufficiently indicated in two of the requests to charge, which, with modifications, were given to the jury:

"I charge you that if the decedent, William A. Peck, by the exercise of ordinary care and prudence, by looking up the track in the direction of the approaching train, could

have seen it in time to have avoided the injury, the omission to do so would amount to such negligence as would defeat the plaintiff's right of action, unless you find that his attention at the time was directed to the two men at the crossing, one of whom it is conceded was an employé of the company, whose duty it was to warn the public of the approach of the fast trains not scheduled to stop at Swartz Creek, and that he had a right to rely on the conduct of the employé on the crossing and treat it as an assurance of safety, and that the circumstances were such as a man of ordinary care and caution would have so treated it.   *   *   *

"If the jury find that a person of ordinary care and prudence driving a horse and buggy as Peck was, after seeing the signals given and in view of all the other circumstances of the case, might by exercising proper care and diligence have ascertained that the train was approaching from the east at the time of the accident, then the plaintiff cannot recover in this case, however negligent the railway company might has been, and although the flagman was not at his post provided with a flag to give warning, unless you find that the defendant by its own act or the act of its duly authorized agent had thrown Peck off his guard, and that he did act under all the circumstances as would a man of ordinary care and caution."

The testimony supposed to sustain this theory may be briefly stated. By an order made in the year 1899 the commissioner of railroads had directed the crossing to be protected by a flagman to notify the public of the approach of passenger trains not scheduled to stop at the station between the hours of 6 a. m. and 7 p. m. each day, except Sunday. There were two of such trains, one in each direction, daily. A rule of defendant, known as rule 197, required white signals to be used by watchmen at public crossings to prevent persons and teams from crossing when trains are approaching. In fact, no flag had ever been used. Instead, the station master, or, as upon this occasion, his assistant, had, after starting the automatic bell to ringing, gone upon the track in front of the approaching train, given to the engineer of the train, with his hand, a signal indicating that the track was

clear, and had then stood in the street in position to warn travelers until the train passed. It does not appear that decedent had knowledge of the order for a flagman, of the rule of the company, or that he had ever crossed the track at or near the time when one of these trains was due there. He was not deceived or misled by failure to employ a signal which had never been employed. The failure or neglect to display a flag was not evidence that the crossing could be made with safety, and was not an invitation to him to attempt it. Was he otherwise invited or misled by the employés of defendant or by circumstances and surroundings for which the defendant was responsible or by both? On the south main line of track, east of the crossing and distant from it from 80 to 100 feet, stood a locomotive with freight cars attached, bound west, and waiting for the passenger train to pass. It had been standing there some minutes. The station master's assistant, having signaled the engineer of the passenger train, in doing which he faced the east, turned and looked to the north, saw decedent approaching and some rods to the north of the track. To him he made signals, using his arm and hand, the palm of the hand towards the north, moving the hand back and forth. A man employed at a nearby elevator and who stood near the defendant's employé made similar signs, and then both left the track of the approaching train, and moved to the south to and beyond the other main line tracks. The tracks are separated by a space of about eight feet. Having taken a position in the highway south of the south line of tracks, they again faced the north, and, seeing that decedent had not slackened speed, was driving fast, and within twenty feet of the north rail, they ran towards him, signaling.

"As his horse was just on the plank of the railroad crossing, he [Peck] faced the east and saw this fast train and stopped his horse. He jerked it right back on its haunches."

This is from the testimony of the elevator man. The

witness Lottie Brewer, already referred to, who was look-
ing from the window of her house 210 feet away, saw the
signal given to the engineer and the signals given to de-
cedent.   She says:

"Mr. Peck did not pay any attention.   He drove right
on the track.   He stopped his horse just a moment.   Then
the train struck him."

There is testimony tending to prove that the automatic
electric bell was sometimes rung when freight trains passed.
It is claimed it may reasonably be supposed that decedent
inferred from the signals that the freight train was about
to change its position, and that it was desirable that he
should cross the tracks before it occupied the highway.
It is said, also, that the freight train not being in motion,
it would appear to decedent that he had ample opportu-
nity to cross in safety.   No one can know what was pass-
ing in the mind of decedent.   We have read the entire
record with care and with the aid of the brief for appellee.
We have discovered no testimony tending to prove that
he was invited by the situation or by any passive or active
conduct on the part of defendant's employé to go upon the
crossing.   He was not only not invited, but reasonable
efforts were made to acquaint him with a danger which
was evident, and which the most ordinary prudence on
his part would have discovered.   If he saw the signals
which were made to him, which seems doubtful, he could
not have misinterpreted them.   No one else who saw them
did so.   The court should have instructed the jury that
the negligence of plaintiff's intestate forbade a recovery.

The judgment is reversed, with costs of both courts,
and a new trial granted.

BLAIR, C. J., and GRANT, MONTGOMERY, and McAL-
VAY, JJ., concurred.