BRALEY *v.* GRAND TRUNK RAILWAY COMPANY OF CANADA.

1. RAILROADS — CROSSING ACCIDENT — NEGLIGENCE — DEATH — SIGNALS.

Where decedent was killed by defendant's train at a crossing, and decedent drove a gentle team which was under control, and was struck by a freight train going from 15 to 40 miles an hour, as the conflicting testimony showed, and it appeared that the headlights were burning and the usual signals were given at the crossing, and plaintiff claimed that decedent supposed the freight was a regular passenger train which was due at the same hour and which ordinarily stopped at the station before passing over the crossing; and the testimony disclosed no reason why the train should not be running at the

speed which the evidence showed as it passed the cross-
ing, defendant as a matter of law was guilty of no negli-
gence and a verdict should have been directed in its favor.

2. SAME—CONTRIBUTORY NEGLIGENCE.

The contention that the plaintiff's intestate believed the
train was a passenger train and would stop at the cross-
ing, based upon no evidence but inference, and coupled
with proof that decedent did not stop before passing over
the crossing, and was struck by the train, was not suffi-
cient to free plaintiff's case of the inference that decedent
was guilty of contributory negligence.

3. SAME—EVIDENCE—TRAINS—OPERATION—LOOKOUT.

Evidence considered and *held*, to show sufficient care on
the part of defendant railroad company in maintaining
a lookout and in operating the train at the crossing.

4. SAME—CONTRIBUTORY NEGLIGENCE—STOPPING TO LOOK.

It is a rule of law, not a mere rule of evidence, that be-
cause a railroad is of itself evidence of danger and trains
are run at high speed and cannot turn out for travelers,
persons crossing the track must stop, look and listen
before entering upon the point of peril.

Error to Livingston; Miner, J. Submitted January
20, 1915. (Docket No. 19.) Decided April 19, 1915.

Case by Elmer M. Braley, as administrator of the
estate of William R. Wood, against the Grand Trunk
Railway Company of Canada for the unlawful killing
of plaintiff's intestate. Judgment for plaintiff. De-
fendant brings error. Reversed.

*Harrison Geer* (*W. K. Williams,* of counsel), for
appellant.

*Louis E. Howlett* (*Odell Chapman,* of counsel), for
appellee.

OSTRANDER, J. Plaintiff's intestate, riding in a
wagon drawn by a team of horses, was killed by de-
fendant's train on a highway crossing in the village
of Gregory (not incorporated), in Livingston county,
at about 7:31 o'clock in the afternoon of November

25, 1912. He was a farmer, 51 years old, possessed of his faculties, had lived nearly all his life on the same street, 1½ miles north of the crossing. Gregory was his market place, and he was accustomed during the winter to go to town, on an average, two or three times a week. He was a good teamster, and drove a gentle team. Upon the occasion in question the team had been hitched in the street 267 feet south of the crossing. From this point it was driven directly to and upon the defendant's track immediately in front of the moving train. The street intersects the track at right angles; the station house being 48 feet east of the east line of the street, and 14½ feet south of the south rail of the track—a small structure 16½ feet square. The street was lighted; one electric light hanging very nearly over the railroad crossing. The train, No. 43, was a freight, with nine loaded, no empty, cars and a caboose, west-bound, was late, did not stop at Gregory, and was running at a speed about which witnesses do not agree—from 15 to 40 miles an hour. Plaintiff recovered a judgment for $4,000, and, in seeking a review of the trial, the defendant contends, as it did in the court below, that no negligence of defendant was made out, and that contributory negligence of plaintiff's intestate was established. There was a motion for a directed verdict and various requests to charge, which, with the exceptions taken, raise these principal propositions.

Questions usually presented in cases of this character are absent. The headlight upon the locomotive was burning, and the usual signals were given. The court in the charge said to the jury:

"I think I am warranted in saying in this case that Mr. Wood must have known that a train was coming."

Plaintiff's counsel said in argument:

"Now, what difference in this case does it make whether or not Mr. Wood, upon that occasion, knew

that a train was coming or not? He had no reason to believe that it was a different train from the one that the defendant told him he might expect to be there. He heard it coming, gentlemen. First, it was right here on that time that the passenger should be there, because he heard it give the same signals, ring the same bell that the passenger train would be giving or ringing, if it was there.

"I notice my Brother Williams acts as though he thought there wasn't any evidence of that in the record, and for his benefit I am going to tell you. The gentleman has said, 'I don't know whether it gave the same signals or not;' but, out of their own breath, the witness that lived there, within 30 rods of the track, heard it all, saw the headlight, and he says, 'I thought it was the passenger train.'

"Gentlemen, as square-headed, sensible men that can think of their own accord, can they now tell us it was giving different signals than a passenger train, when all those old citizens and persons living near the track thought it was a passenger train on account of hearing the same signals, the same bell, the same kind of a headlight?

"Not only did Mr. Wood hear the same signals that the passenger train usually gave and give them at the same place, but, gentlemen of the jury, he saw the same headlight, and it was with a great deal of pleasure that I heard my brothers put in that testimony of that fact in this case, and it was with far greater pleasure that I heard them arguing that fact to this jury that those signals were all given there. What effect did it have upon poor Mr. Wood? Oh, it was saying to him, 'Here's the passenger train; don't you hear that whistle?' I have no doubt but he heard it, and gentlemen, I am perfectly willing to concede all that my brothers have said about his hearing it and about his hearing the bell and about his hearing the noise of the train coming down. Of course he did. He saw the headlight, and what did it do? It lured him on; it enticed him on to believe that it was a passenger train going through. Yes; like the song of the siren it lured him on to his danger and his fate, and the daughter was left an orphan, and the good wife was made a widow."

The real issue, upon the decision of which the plaintiff relied, at least after the trial had progressed for some time, involved the admission of the fact that plaintiff's intestate knew that a train was approaching. His theory was fairly stated by the learned trial judge in a portion of his charge to the jury as follows:

"Plaintiff further claims that at the time said freight train passed through said village of Gregory there was a passenger train which was due, and that a freight train was running on the passenger train's schedule time or one minute thereafter; that plaintiff's intestate was acquainted with the fact that said passenger train was due at that hour, and, relying upon said knowledge, drove across said railroad crossing at Main street. So that presents a question for your consideration, to determine whether the railroad company at the time in question was in the exercise of such care and took such precautions as the dangerous nature of the crossing required. Ordinarily the giving of the statutory signals is sufficient to protect travelers upon the highway who desire to cross the railroad track; but, if you should find in this case, by a preponderance of all the evidence in the case, that a passenger train was due at Gregory from the east at 7:30 on the day in question, and that it did not arrive there until some time thereafter, but that at 7:31, or one minute later than the schedule time of the passenger train, a freight train from the east went over said railroad and across said highway at upwards of 40 miles per hour, and it was dark, and there were obstructions between the track upon defendant's right of way and the public highway south of said railway track which obstructed or partially obstructed the view of the engineer or fireman and prevented them from seeing pedestrians coming from the south of said railroad track on said highway, and also prevented or partially prevented pedestrians coming from the south upon said public highway, going across said railroad, from seeing an approaching train, then and under such circumstances it woud impose an additional duty upon the railroad company to exercise additional caution in approaching the crossing, and such duty would be commensurate with

the peril to which travelers would be exposed who, with due care, were about to make the crossing, and in such a way as to give travelers an opportunity, by exercising due care and diligence, to meet and guard against the danger; and, if you find from all the evidence in this case that, under such circumstances, defendant did not exercise additional caution in approaching the crossing, then and in such case defendant would be guilty of negligence."

Read in connection with that part of the argument of counsel which has been quoted, no one is left in doubt concerning plaintiff's theory. I am impressed that no such theory as this is indicated in the declaration—a point, however, which is not made by appellant. Assuming that the declaration may support the verdict and judgment, and that facts sustaining the theory would support a finding of negligence on the part of defendant, the theory is not supported by facts. The train which caused the injury was usually late, passing through Gregory at different hours during the afternoon and evening without stopping. The passenger train, on the time of which the freight was running, was very often late. Upon these points there is no dispute. The fact that the train was a freight train running close to the announced or schedule time of the passenger train, that it was traveling at a high rate of speed, and that it did not stop at the station, are none of them necessarily evidence of negligence.

Gregory is a village of 175 people; its business places, few in number, being mostly south of the railroad. Its single business street is 78 feet wide. As has been stated, the station was 48 feet east of the street. There is then an open space of 192 feet along the track to the elevator, which stands 17½ feet south of the south rail. The elevator was 84½ feet in length, east and west. East of it, 8½ feet, is a coal shed 36½ feet long, east and west, standing 18 feet

south of the south rail. East of this, 15 feet, is a freight depot 50½ feet long, east and west, and 20 feet, north and south. Then, in this order, was a 90-foot coal shed, the stockyard, the east fence of which was 691.5 feet from the center of the crossing, a tool shed 1,052½ feet east of the crossing, and the east crossing, which was 1,350½ feet from Main street. There are no buildings south of the station along the east line of the street for 174.5 feet, so that, looking easterly, or northeasterly, plaintiff's intestate could see, while traveling the most of this distance, the west end of the elevator. There was nothing about the traffic on this street to call for particular care on the part of defendant's servants, exciting them to do more than to give the crossing and station whistles and keep the bell ringing.

Plaintiff cites in the brief, and relies upon, *Marcott* v. *Railroad Co.*, 47 Mich. 1 (10 N. W. 53); *Battishill* v. *Humphreys*, 64 Mich. 494 (31 N. W. 894); *Guggenheim* v. *Railway Co.*, 66 Mich. 150 (33 N. W. 161); *Klanowski* v. *Railway Co.*, 57 Mich. 525 (24 N. W. 801); *Hagan* v. *Railroad Co.*, 86 Mich. 615 (49 N. W. 509); *Morse* v. *Railway Co.*, 168 Mich. 99 (133 N. W. 935); *Detroit, etc., R. Co.* v. *Van Steinburg*, 17 Mich. 99; *Huggett* v. *Erb*, 182 Mich. 524 (148 N. W. 805). It is, no doubt, the rule that the rate of speed at which trains may be properly— prudently—operated depends upon circumstances. Speed which would be prudent in the open country would be imprudent, generally, in and over the streets of a city. And as people and animals do sometimes go upon railroad tracks, and sometimes find themselves in peril upon highway crossings, a lookout from the engine is necessary that disaster may be, as often as is possible, averted. Nor may one in plain view upon the tracks, especially if that one is an infant, be run down by a train, but the train must be oper-

ated as the circumstances seem to require. Statutory signals must be given, and it is negligence not to give them. So much, in substance, and no more, the cases cited above hold to be the law.

A witness sworn for the plaintiff saw the plaintiff's intestate, whom he knew, and a boy who was with him, when the team was unhitched, and they got into the wagon. He stood by the side of the wagon and talked with Wood, the deceased. The witness heard the train (he was intending to take the passenger train) at about the time the team started. The train whistled, and the witness started diagonally across the street to the east side and followed the sidewalk north towards the railroad.

"I could hear the noise of the train," he says, "coming all the time after I struck the sidewalk, but could not see it. The train was right in front of the elevator when it whistled. I think it whistled more than once when it was right by the elevator. I couldn't say how many times. I didn't know it was a freight train up to that time. I continued on my way to the passenger house. I saw Mr. Wood after he and I parted. He was driving along the street towards the railroad. I couldn't say whether he or the boy were driving. When the train came by the elevator I think Mr. Wood's team was nearly on the track. By that I mean nearly on the rails. I heard the train whistle about the same time that I saw it by the elevator. I couldn't say whether there was any place where you could see the train or not before it got west of the elevator. I didn't see it before it got west of the elevator. About the same time I saw it I heard it whistle. At that time Mr. Wood's horses were nearly on the track. I couldn't tell exactly because I just glanced that way. I saw Mr. Wood stand up in the wagon as though he was trying to urge the team. I didn't watch it all the way, because I was looking first at him and then at the train. I was probably 50 feet from the railroad track. I saw the engine strike the wagon at the crossing. I think it struck about in the middle. I couldn't say how fast his team was going as he crossed over the track. From my experience in riding on trains

and automobiles and things of that character I have some judgment of the speed at which trains pass. I think this train was going at least 40 miles an hour. After it crossed Main street I should think it stopped a full train length west of the crossing. I saw both Mr. Wood and the Backus boy after the accident. I went directly up to the Main street crossing after the accident. I didn't see the team, but I saw the box part of the wagon. I noticed that more than anything else. It was south of the track and against it, on the west side of the street. It was over near the fence; that is, the fence down to the cattle guard. It was probably 20 feet south of the track. Mr. Wood was found, I should say, about 50 feet west from the crossing, maybe farther, maybe not quite so far. He was dead when found. The Backus boy was found on the pilot of the engine sitting up. He was dead when found. I took the passenger train that night for Jackson. The regular passenger train going to Jackson had not arrived at the station in Gregory when this freight train went through."

On cross-examination the witness testified:

"I think I was walking about 4 miles an hour. About the time I saw this train I heard it give a couple of blasts of the whistle. I think two, anyway. About the same time I got a report of the whistle I saw the reflection of the headlight as it came into view. The headlight on the engine was lighted. I observed the train part of the time as it came into view from the westerly end of the elevator. I was probably looking at the train and team both. I think I was paying attention to what was occurring there. I didn't do anything. There wasn't anything I could do. I couldn't say whether I called to Mr. Wood or not; I probably did. I couldn't say whether I said anything to him or not. About the time the train came from the east corner of the elevator Mr. Wood's horses were just going onto the track. I couldn't say whether they were right on the track or near to it. I was looking at them just after I observed the train come from the west end of the elevator. I saw Mr. Wood stand up in the wagon. He was standing up at the time I looked. I didn't observe him get up.

"Q. What was he doing?

"*A.* He was trying to—just as though he was trying to urge his horses across the track.

"*Q.* Was it light enough so you could see that?

"*A.* Yes, sir.

"*Q.* Did you see him strike his horses?

"*A.* Well, striking at them with something; I could see."

A witness for defendant testified,

"I am 51 years of age. I have lived in Gregory about 23 years now. I have been employed for the last few years as section hand for the Grand Trunk Railway Company. I was working for that company in the month of November, 1912. I have been working for them 5 years last fall. I am working for them now in the capacity of section man. I was in Lawrence McClear's meat market on the night of November 25, 1912, between the hours of 7 and 8 o'clock. That store is on the west side of Main street towards the extreme south end of the business portion of Gregory. It is next to the hardware. I don't remember now who else was in the store with me. I knew William R. Wood in his lifetime, and have seen Winfield Backus some few times that summer. I didn't see Mr. Wood or this Backus boy that night until after the accident. At the time I was in McClear's store I did not hear any noise or signal which was given by an approaching train. I live 80 rods east of the crossing, in the village of Gregory. That would practically bring me down to what has been called in this record the east crossing. I live 18 rods from this east crossing. I live across the street from George Meabon. In going from my home to the business part of the village of Gregory, and coming from the business part of the village back to my home, I usually go down the walk to the railroad, down the railroad home; that is, down the walk to Main street to the depot; then east on the right of way to the east crossing, then south to my home. On this night in question I had started home before I heard any train. I didn't hear or didn't notice any train until I got within probably 60 feet of the railroad. Up to this time I hadn't seen Mr. Wood or this boy. When I got to this place I heard the train whistle. I could see it as I looked up. It was just about at the stockyards. All I heard was

two short blasts. I could hear them distinctly. There
was no one with me. After I heard those two blasts
of the whistle I looked up and saw the train. I could
see the headlight; it was burning. When I saw the
train it was about in front of the freight shed. I did
not hear any other whistle afterwards. I could hear
the roar of the approaching train running on the rail.
I was just walking along leisurely at this time. I
looked up right away and saw the wagon coming up
by the side of me on the street. I was on the side-
walk, on the east side of Main street. The team was
then just about abreast of me in the highway. I did
not know then who was in the wagon. The team was
traveling along leisurely. That was the first I had
seen of the team; I saw them as they approached the
track. They were still trotting.

"*Q.* As you saw them as they were approaching the
track, state whether or not they had increased their
speed or diminished it from what you saw before?

"*A.* I calculated they was considerable faster. I
didn't say anything at that time. When I first heard
them I hollered. I simply hollered, 'Whoa!' and
looked back to the train again. As I passed along
toward the depot I saw the outline of the train as
it came in. From the time I first heard this whistle
down until that time I could still hear the noise or
the roar of the incoming train. I heard the noise from
the brakes or wheels of the train as it was passing
in front of me. I heard the grating of the brakes and
saw the sparks—the fire from the wheels on the rails.
That was when the wheels were setting on to the rails.
I didn't hear any crash there, nor did not see what
the men were doing in the wagon. I went right along
into the depot to speak to the agent. I calculated
there had been an accident. I went back and hunted
for the man with the rest of them. There was another
party there at that time; I didn't know who the party
was at that time. The agent spoke to me; then an-
other man stuck his head in the door and said, 'There
is a man killed.' He was behind me. I didn't look
around to see who it was. He was gone in an instant.
Then I went back over to the scene of the wreck. I
saw the train crew that night. I saw this flash of
fire as it has been described here by some of the wit-
nesses. It was a flash of light along the engine just

after it passed a crossing. It was just a flash back and forth. It covered nearly the whole top of the boiler clear through the length of the engine. I didn't notice that the train crew had received any injuries until I saw them the next morning in Gregory. I saw that the engineer's eyebrows were burned, but did not notice anything particularly different with the fireman. I think this local freight, No. 43, was scheduled to come into Gregory at 2:20. That train was nearly always late. I have known it to stay there overnight; to be tied up. I have known of its getting in so late it would be clear over into the evening when they came in very often. I have known of the passenger train which was scheduled to come through there at 7:30, No. 29, the one going from the east to the west to Jackson, being late. It's hardly ever on time. It's very often late; anywhere from five minutes to a couple of hours. When the passenger train, No. 29, comes into the station to discharge and take on its passengers the engine or tender of that train nearly always covers the Main street crossing. That was quite often true prior to the month of November, 1912. When it laid across the Main street crossing it would block traffic going up and down that street."

On cross-examination he testified:

"When I heard the whistle I saw it down past the elevator, down by the freight house. At the time I saw the train after it whistled it was down by the freight shed. I saw it almost the same instant I heard it whistle. At that time I looked up and this wagon was coming along behind me, and the horses were about opposite me. I have never measured the distance from there down to the crossing. I should think it would be 390 feet. When I first saw the wagon they were driving along leisurely, and at that instant I hollered, 'Whoa!' I didn't know it was going straight through until after that. As soon as I hollered I looked back to see whether it was coming straight through. I couldn't see whether it was a freight train when I hollered. I could see the headlight; that was all. I don't know whether they heard me. They didn't respond or indicate that they heard me. If this train was running 42 miles an hour, which

was its rate from Gregory to Pinckney, it probably would take about four seconds for it to run from the freighthouse to the crossing. Mr. Wood was nearly over the track when the train struck him. I didn't know the train was going that fast. I have said it was as far as 300 feet, but I never measured it. I have given my best judgment on these matters. When the train went across the crossing I could hear the brakes grind on the wheels, and they were set so tight that even the fire was flying off from the wheels. That train didn't run quite 960 feet west of that crossing before it stopped. I didn't measure it, but I have counted the rail lengths beginning right at the center of the crossing, at the traveled track, to where the pilot of the engine stood when the train stopped. I counted 30 rail lengths, each 28 feet long, making 840 feet. Notwithstanding the fact that those brakes were shut so tight that when it ran across that crossing the fire was flying, that train ran 840 feet before it stopped. At the rate of speed that train was going I think it made a good stop. I counted eight or nine cars in that train without the caboose, engine, and tender. They were claimed to be loaded. When they stopped the whole train was west of the crossing. I don't know how far it was from the driveway across Main street to the caboose beyond the fence by the cattle guard."

A considerable number of witnesses gave testimony to the effect that they heard the signals given by the train, not only those given when it reached the elevator, but signals given when it was east of what was called the east crossing.

If the question of defendant's negligence is at all doubtful, there can be no doubt about the carelessness of plaintiff's intestate. There was much at the time which demanded particular care on his part. The conjecture indulged by his counsel is that, knowing, as many others did, that the train was coming, he believed it to be the passenger train, that it would stop at the station, and that he speculated upon the chances of being able to cross the track ahead of it, resolving the speculation in favor of trying to do so. Plaintiff

may not assume that his intestate had the knowledge imputed to him to sustain a recovery and exclude the assumption that he also had knowledge of other facts, which have been stated, connected with the running of trains. There is no basis for such a distinction. Mr. Wood did not stop, and it requires no argument to prove that the reasonably prudent man would have stopped.

In approaching and passing the station, the fireman was putting in coal, and only the engineer was on the lookout. And it is argued with much earnestness that the lookout was insufficient, and, considered with reference to the speed of the train, wantonly careless, reckless conduct of the train crew may be found. There is no testimony tending to prove that the predicament in which the injured man placed himself was discovered, or that his intention to cross the track could have been discovered, in time to avoid the collision. A little increased speed of the train would have saved the unfortunate man in this case quite as effectively as a lessened speed. This is true in most of such cases. By what rule, then, shall railroad trains be operated? If in such manner that injury to one acting as plaintiff's intestate may be avoided, what will that manner be? The law has provided, for the safety of those upon the highways, that certain signals shall be given by approaching trains; that warning signs shall be erected.

The rule has been long in force that, because a railroad is itself evidence of danger, and because trains are run at speed, and cannot turn out for travelers, the traveler shall stop, look, and listen before attempting to cross the track. The safety of those upon trains, as well as those upon the highways, is considered in these statute precautions and in this rule. The rule of look and listen, under the circumstances disclosed, is not a mere rule of evidence, but

a rule of conduct—a rule of law. *White* v. *Railway Co.*, 147 Wis. 141 (133 N. W. 148). See, also, the large number of cases digested in 4 Mich. Digest, Annotated, tit. "Railroads," §§ 327, 328. The defendant observed the statute precautions, and, although this will not in all cases absolve it from responsibility, I am unable to find in the facts in this case reason for requiring greater care than was exercised. In its principal features the case is not unlike the one of *Peck* v. *Railway Co.*, 155 Mich. 430 (119 N. W. 578). In my opinion, contributory negligence was, as matter of law, established, and upon both points which have been discussed the court should have directed a verdict for defendant.

The judgment is reversed.

BROOKE, C. J., and MCALVAY, KUHN, STONE, MOORE, and STEERE, JJ., concurred with OSTRANDER, J. BIRD, J., concurred in the result.