66 150 / 74 93
66 150 / 87 380
66 150 / 96 309 / 96 340
66 150 / 103 340
66 150 / 104 428
66 150 / 111 277
66 150 / 114 416
66 150 / 118 213
66 150 / 120 125
66 150 / f122 426
66 150 / f125 16
66 150 / 139 10 38 / 140 567
66 150 / 143 3168 / 144 3 29
66 150 / 145 1196
66 150 / 157 7162

LEVI GUGGENHEIM, ADMINISTRATOR OF THE ESTATE OF ISAAC MANHEIMER, v. THE LAKE SHORE & MICHIGAN SOUTHERN RAILWAY COMPANY.

[See 57 Mich. 488.]

*Negligence—Injury at railroad crossing—Evidence—Speed of train—Duty of person crossing track.*

1. In determining whether a plaintiff was entitled to go to the jury with his case, the testimony on his part can alone be considered.

2. Where, on the trial of a suit by an administrator against a railroad company for killing the intestate, a witness for defendant testified to telling the deceased that a train was approaching,—
   *Held,* no proof of negligence on the part of the deceased in driving onto the track unless it appeared that he *heard* and *understood* what was said.

3. Any intelligent witness who has been accustomed to observe moving objects is *competent* to testify as to the *rate* of speed of a moving train (*Detroit & M. R. R. Co. v. Van Steinburg,* 17 Mich. 99); but opinions on *relative* speed, without some standard of rapidity, are of no value by themselves (*Grand Rapids & I. R. R. Co. v. Huntley,* 38 Mich. 540).

4. Where a railroad company is required to sound an alarm, or is in the habit of blowing whistles and ringing bells at a highway crossing, a traveler has a right to rely somewhat upon the observance of this duty or custom; and if his view of the railroad track is temporarily obstructed by standing cars, when he has looked and listened, and heard no warning of a coming train, and none is expected·at the time, ordinary prudence will not dictate that he should stop his team, and go on foot upon the track, simply because he could not determine with *certainty* by sight alone that a train was not approaching.

5. As this case is now presented, the question whether the deceased ought to have stopped before attempting the crossing was one of fact for the jury.

6. In running its trains over public highway· crossings, it is the duty of a railroad company to exercise a degree of care commensurate with the peril to which travelers are exposed who seek with *due care* to make the crossing.

7. In the absence of statutory regulation limiting the speed of railway trains at highway crossings, such speed must be consistent with the degree of care and prudence required in good railroad management; and if such crossing is a dangerous one, and the view of travelers is obstructed by standing cars or intervening buildings, so as to interfere with a view of approaching trains, it is the duty of the company to give due and timely warning of such approach, by bell or whistle, or both, or by some other means, and in such a way as to give travelers an opportunity, by exercising due care and diligence, to meet and guard against the danger.

8. In a suit for injuries sustained by a traveler at a public highway crossing by collision with a railroad train, the burden of proof is upon the plaintiff to show the absence of contributory negligence on his part.

9. In such a case the jury have nothing to do with the habits or care or want of care of the plaintiff in crossing at the same place at other times, but the inquiry is limited to the particular time when the collision occurred.

10. While it is the duty of a traveler before crossing a railroad track, under *all* circumstances, to look and listen for an approaching train, he is not bound to the same degree of care where no train is due, and he has no knowledge of its approach, as when these conditions confront him.

Error to Hillsdale.     (Howell, J.)     Argued February 10 and 11, 1887.     Decided June 9, 1887.

Case.     Defendant brings error.     Affirmed.     The facts are stated in the opinion.

*Weaver & Weaver* (*George C. Greene, Ashley Pond,* and *O. G. Getzen-Danner,* of counsel), for appellant.

*E. L. Koon* and *M. McIntyre,* for plaintiff.

MORSE, J.   This case was before this Court in the April term of 1885, and an opinion filed therein September 29, 1885. It was reported in 57 Mich. 488.   The surroundings of the track and crossing where the accident occurred are fully described in the opinion of Mr. Justice SHERWOOD in that case, and need not be restated, except in such instances as

may be necessary to make clear some of the points now raised and here disposed of.

It is again contended that the court below should have instructed the jury that the plaintiff could not recover because of the contributory negligence of the deceased. After a careful examination of the evidence, I am of the opinion that there was testimony in the case sufficient to go to the jury upon the question of the due care and prudence of Manheimer in attempting to make the crossing. There was also evidence tending to show negligence upon the part of the defendant which was the proximate cause of the death of plaintiff's intestate.

It is claimed that there is additional evidence showing almost conclusively that Manheimer was warned of the coming of the train just before he reached the track,—testimony not given upon the previous trial. In the main, the evidence adduced on the part of the plaintiff does not differ materially from the testimony introduced in his behalf upon the other trial. It appears that Manheimer was driving along Union street towards the north. He was riding in a democrat wagon, drawn by a very slow and lazy mule. His son, a lad about ten years old, was riding with him. No train was due, and there was no evidence that one was expected by Manheimer. In fact the train was nearly two hours late, and there was evidence tending to show that it came rushing through at a rate of from 20 to 40 miles an hour, without sounding a whistle or ringing a bell at or before the street crossing. The view was more or less obstructed, as shown in the former opinion. Manheimer was going very slow, and, according to the testimony of his son, looked and listened for the train, but he did not stop before crossing.

One John Dodge, a farmer residing in the town of Adams, was passing up Union street at this time, in the same direction and behind Manheimer. He first saw the deceased about 8 or 10 rods south of the crossing. Dodge caught up

with him, and let his team walk behind Manheimer's wagon. He testifies that the deceased was going very slow. Dodge heard no whistle or bell, or any intimation that a train was approaching. All at once the train flashed by and struck the mule Manheimer was driving.

Daniel Gillett, a witness for the defendant, testified that he drove across the track going south. He heard the whistle of the train, and it scared his horses, and they started on a good jog. As he was trotting by Manheimer he hallooed to him twice, and told him a train was coming. Manheimer looked at him, and said nothing. On being asked if Manheimer understood what he said, he testified:

"I did not think so afterwards, when I heard he was catched; thought he could not have understood me, or that he did not pay any attention to it. I do not know whether he understood what I said. After I heard he was killed, I supposed, of course, he could not have understood me, or he must have thought I was fooling him. His boy did not say anything. He was standing up behind in the wagon. Of course I could not watch him a great deal, for I had my own team to look after. I thought from the glance that I gave the boy that he reached over to stop him."

C. W. Dunton, also a witness for the defense, testified that he was coming south on Union street. Met Manheimer about half way from the crossing to Railroad street. (From the center of the railroad track at the crossing to the north line of Railroad street the distance is 208½ feet.) Dunton is a law student, and was then about 16 years old. He was driving a double team and wagon. He had seen or heard the train coming, and went over the track on a brisk trot. His horses were on a gallop when he passed Manheimer.

"It was a matter of custom with us in coming from the north side to warn persons crossing from the further side that the train was coming. That is the reason I spoke to him. I spoke to him, in effect, to whip up his mule."

He could not tell whether Manheimer heard him or not.

It is claimed that the testimony of these two witnesses estab-

lishes, with other evidence, the fact that Manheimer, without the exercise of any care or caution, rushed blindly into the danger, and was grossly negligent. The court was also requested to instruct the jury that, if they believed that Manheimer was. told by Gillett that the train was coming, then the plaintiff could not recover. In accordance with the well-settled rule, we cannot take into consideration the testimony upon the part of the defendant in determining whether the plaintiff was entitled to go to the jury upon the case made by him. There was evidence tending to show that Manheimer looked and listened before crossing. The weight of that testimony and its truthfulness was for the jury, and not for the court. Besides, there is no proof that he heard what Gillett said, or understood his remark. What Dunton said to him had no reference whatever to an approaching train. As the witness Gillett thought, it is not very probable that Manheimer understood from him that the train was coming, and yet drove upon the track as he did. The instruction was properly refused. It would not be sufficient that he was told the train was coming. It should also appear that he heard and understood what was said to him.

Dunton was permitted on cross-examination, against objection, to testify that he had often before this joked Manheimer about his rig and his mule. We can see no harm in the admission of this evidence, nor any reason why it was not competent. As the evidence shows that Manheimer was always whipping his mule, and was doing so when Dunton told him to "whip up his mule," it would seem that the fact of Dunton frequently joking him about the mule would have a pertinent bearing upon the question whether Manheimer understood the remark as indicating danger from an approaching train, or as a mere joke or pleasantry.

It is also urged that error was committed in allowing two witnesses, Williams and Campbell, to compare the speed of the train at the time of the accident with the speed of the

same train on other days before the injury occurred. It was held by this Court in *Detroit & M. R. R. Co. v. Van Steinburg,* 17 Mich. 99, that any intelligent man who had been accustomed to observe moving objects was competent to testify as to the rate of speed of a moving train. It was observed by Chief Justice CAMPBELL in *Grand Rapids & I. R. R. Co. v. Huntley,* 38 Mich. 540, that opinions on relative speed, without some standard of rapidity, are of no value by themselves. It is probable that in the present case the testimony of these witnesses was of little worth, but yet there was no error in receiving it, as it was competent as far as it went.

The other exceptions in the record are all directed against the charge of the court. It is alleged that the circuit judge committed error in refusing or modifying defendant's requests, and also in certain portions of the charge given upon the court's own motion. Upon a careful examination of the instructions, we find that many of the requests refused were substantially given in the main body of the charge. Those refused were:

*First.* That the plaintiff could not recover.

*Second.* "(13) In this case, if Manheimer's view of the railroad track to the east was obstructed by buildings or cars on the side track, or any intervening object or objects, so that he could not determine with certainty whether or not a train was approaching from the east without stopping, then it was his duty to stop, and, if necessary, to go ahead of his team on foot, and examine so as to determine with certainty. And if he went upon the track without taking such precautions he did so at his own peril, and your verdict must be for the defendant.

*Third.* "(14) It was not enough for Manheimer to merely turn his head, and look to the east, just before driving upon the track, but, as before explained to you, he was bound to stop, and make sure that there was no danger."

*Fourth.* "(19) There is no law in this State regulating the speed of trains, and the company had the legal right that day to run that train at the rate of thirty miles an hour at that place."

*Fifth.* " (21) There is no law in this State requiring the company to sound the whistle for street crossings in the city of Hillsdale, unless required to do so by the common council of the city of Hillsdale; and there is no evidence in this case that at the time of this accident such whistles were required to be sounded; and so I charge you, as a matter of law, that at the time of this accident the company was under no legal duty or obligation to sound whistles for any of the crossings in the city of Hillsdale.

*Sixth.* " (22) The positive testimony of the witnesses who heard the train, and who heard the bell and whistle, is not contradicted by that of those who did not hear them; and such testimony establishes the fact that Manheimer could have heard the train if he had stopped and listened. Whether one does or does not hear, so that he can testify to a given sound, depends upon the degree of attention he may give to its source. The familiar example of several persons being in a room where there is a clock, one or more of whom state that they heard it strike, while the others testify that they did not hear it, is an apt illustration of the difference between mere negative and contradictory evidence. If the witnesses are equally credible, although the number of those who say they did not hear it exceeds that of those who say they did, yet the testimony of the latter is to be regarded as establishing the fact, because it is consistent with, and not contradictory to, the negative evidence."

*Seventh.* "(25) A railroad crossing is a place of danger, and is of itself a warning to one about to go upon it to be careful and vigilant to the extent of his opportunity. And it will be presumed, under ordinary circumstances, in case of collision, that he did not look or listen, or, if so, that he heedlessly disregarded the knowledge thus obtained."

*Eighth.* "(28) In determining whether or not Manheimer was careless on the day in question, the jury may and should take into consideration the proof, if any has been given, of his habits of care or want of care in crossing at that point previous to that time.

*Ninth.* "(29) If the jury believe that Manheimer was told by Gillett that the train was coming, then there can be no recovery in this case."

The first and ninth have been heretofore sufficiently discussed.

The second and third may be considered together. It is not insisted very strenuously that, under the circumstances

of this case, Manheimer should have stopped, got out of his wagon, and went ahead of his team to look down the track before crossing. If this was required of Manheimer at a time when no train, running at stated periods, was due, it would necessitate also that every person passing along Union street, under like circumstances, should stop his vehicle, and go to the track on foot, before attempting to cross. This is more caution than the law requires. It is more care than ordinarily prudent men take. When the railroad company is required to sound an alarm, or is in the habit of blowing whistles and ringing bells, it seems to me that the traveler in the highway has a right to rely somewhat upon the observance of this custom or duty. And if the track is obstructed temporarily by freight cars, as in this case, shutting off to some extent the vision, so that the cars cannot be readily perceived, when the traveler about to cross has looked and listened, and heard no warning or premonition of the coming train, and none is to be expected at that time, I do not think that ordinary prudence would dictate that he should stop his team, and go on foot upon the track, simply because he could not determine with certainty by sight alone that a train was not approaching.

"The negligence of the defendant, which could not have reasonably been anticipated, should not be allowed to impose a degree of care and diligence upon the deceased unknown to the law, and which would not have been required if ordinary attention and prudence had been exercised by defendant." Opinion of Justice SHERWOOD in this case, 57 Mich. 494.

From an examination of the briefs filed and the opinion of this Court when the case was here before, it will be found that this same point was then raised. It was insisted then, as it is now, by the counsel for the railway company, that under the circumstances it was the duty of Manheimer to stop before crossing, and that, if he did not do so, it was negligence in law upon his part. This Court then thought otherwise, and

I am satisfied that, as the case is now presented, the question whether the deceased should have stopped before attempting the crossing was one to be properly determined by the jury, and not by the court. The jury were instructed by the court over and over again that it was the duty of Manheimer to look and listen, "to use his eyes and ears," and to take every other reasonable precaution to ascertain if a train was approaching, and, if he failed to do this, he was negligent; and that, under the circumstances, it was necessary for him to exercise a higher degree of care, if the sight of the trains was obscured by buildings, or the noise of their approach deadened by such buildings. Whether Manheimer should have stopped or not was for the jury. *Laverenz v. C., R., I. & P. R. Co.*, 56 Iowa, 689 (10 N. W. Rep. 268); *Massoth v. Delaware & Hudson Canal Co.*, 64 N. Y. 524, 531; *Terry v. Jewett*, 78 Id. 338; *Davis v. N. Y. Cent. & H. R. R. R. Co*, 47 Id. 400.

The fourth and fifth were properly refused. The court instructed the jury, in these respects, that in running its trains over the crossings of public highways it is the duty of the railroad company—

"To exercise a degree of care and prudence commensurate with the danger and peril to which persons, who are seeking with due care and caution to cross the track, are liable to be exposed by its trains, so that they may have a reasonable opportunity, by the exercise of due care and prudence on their part, to save themselves from injury;—"

And that if at the time of Manheimer's death the crossing was a dangerous one, and if, as he approached the track, his view was cut off or obstructed in a measure by intervening buildings and freight cars, so as to interfere with his seeing its approach or knowing of it until it was dangerously near, it was the duty of the defendant to give due and timely warning of the approaching danger, either by bell, whistle, or both, or by some other means, and in such a way as to

give him an opportunity, by due diligence and care, to meet and guard against such danger; and that the absence of any statute requiring it would not, under such circumstances, relieve the railroad company from giving due and timely warning, by whistle or otherwise, of the approach and passage of its trains over a dangerous crossing of a public street; and that while there was, at the time of the accident, no statute limiting the speed of the train over this crossing, yet the speed of such train must nevertheless be consistent with the degree of care and prudence required in good railroad management, and that such crossing must be approached and passed over with the care and prudence commensurate with the rate of speed attained, and the train managed and controlled with that degree of care and prudence required for the safety of the lives and property of the persons rightfully approaching and traveling over such crossing.

It needs no argument to demonstrate that the court was right in these propositions. It would be a queer doctrine to establish that a railroad company could do what it pleased with its train in running over a crossing like this, unless interdicted by some statute, without any regard to that common care and prudence that the law requires from all to protect the lives and property of others.

The sixth proposition was also properly refused. The weight and the truth of the testimony in such cases, we have repeatedly held, is to be determined by the jury. It was properly submitted to them by the court.

In regard to the seventh proposition, we know of no presumption in law that, in a case of collision under ordinary circumstances, the injured person did not look or listen, or if he looked and listened that he heedlessly disregarded the knowledge obtained by looking and listening. The burden of proof was upon the plaintiff to show a want of negligence in the deceased contributing to the injury, and the court so instructed the jury. Further than this he was not

required to go, nor was he obliged to repel any presumption arising from the mere fact of collision that Manheimer did not look or listen, or, if he did, rode heedlessly and purposely to his death.[1]

Nor had the jury anything to do with the habits of care or want of care of Manheimer in crossing at this point at other times. The inquiry was legitimately confined to the crossing at this particular time when his death occurred. It could not avail his administrator in this action how careful he had been in crossing at other times, if he was negligent on this occasion; nor could the liability of the defendant be lessened if it were negligent, and Manheimer was not negligent, at the time of his death, by the fact that he had been careless in crossing the track at some other time. And whether a man is careless or not careless depends always upon the facts and circumstances surrounding the particular transaction being inquired into. The manner of crossing this track at one time might be heedless and careless, and at another cautious and prudent enough, depending upon a number of things, though the method of crossing was exactly the same at both times.

The court was asked so instruct the jury that it was not negligence on the part of the company to leave the freight cars standing on its side track, or for its train to be behind time on the day that Manheimer was killed. The instruction was given with the modification or explanation that, if the freight cars were so placed as to cut off the view of approaching trains, and make it more difficult for persons crossing the street to see the approach of trains, and to know the danger they were in, then such placing of the cars by the company imposed upon it an additional duty of giving such additional warning as this increased danger required; and that the fact that the train was off time increased and heightened the duties which rested upon the company to give such additional

---

[1] See *Mynning v. D., L. & N. R. R. Co.*, 64 Mich. 94 (head-note 6).

warnings of its approach as would enable persons in the street, who were not aware that it was off time, opportunities to guard against dangers more carefully than they would from regular trains at the regular time.

"If the company made up by increased diligence and care in guarding people against the dangers to which they would be exposed by reason of the train being off time, why, then, they would not be guilty of negligence; but if, instead of doing that, they ran the train into town at an unusual rate of speed, and without the additional care thereby required, that would be negligence itself, if it was a wild train or behind time. Even if they ran it into town at the ordinary speed, but failed to give proper signals, and failed to observe that duty of increased care which the fact of a train being off time required, why, then, that would be negligence."

I think the case was properly presented to the jury by the court in this respect. The railroad company had a right to use its track as it saw fit in its business, provided, however, that it did no injury to the legal rights of others. The use of the property of corporations and individuals must be qualified and restricted to some extent because of the duties and obligations that all men owe, under the law, to their neighbors or the public. The railroad company cannot use its track in such manner as to unnecessarily increase the hazard to the lives of the people crossing it upon the highway. If the company obstructs the view of its track at a public crossing, like the one in question here, it must certainly be bound to take whatever extra precaution to prevent collisions or accidents that its own conduct has made necessary and material to save the lives of others, who have the same right to use the public highway at this crossing that it has. It cannot block up the view of its track by leaving cars standing thereon, and then excuse its want of any extra care to guard against accident by saying there is no statute law against so leaving its cars, or requiring any additional warnings because of such cars being so left in the way of the traveler's sight. The law imposes the duty of extra watch-

fulness without any statute, both upon the company and the traveler in the highway in such cases.

And it is well to remark right here in relation to the duty of the company to have stationed a watchman at this crossing. It is claimed that the court, in his instructions to the jury, although he did not speak of a flag-man or watchman, repeatedly stated that it was the duty of the company to give additional warning of the coming of the train because of the condition of its track at the crossing, by reason of the freight cars standing upon such track. The railroad company is not compelled to keep a watchman or flagman at every street or road crossing where a jury, upon a trial like this, might think it necessary to have one stationed. This matter is regulated under the statutes of our State by the Railroad Commissioner. See *Battishill v. Humphreys*, 64 Mich. 494. But, nevertheless, when a railroad company so obstructs its track that its trains cannot be seen by those approaching a crossing, and so that the signals required by statute, the bell and whistle, are not sufficient to warn the traveler in the highway of the coming of its trains, it is very clear, to my mind, that some additional warning must be given, and there are cases where a flag-man would be necessary to acquit the company of negligence.

The Railroad Commissioner might well determine that at this crossing, or any other, in the ordinary and usual use of it by the company, no watchman was needed, and yet the company might, by an unusual and more dangerous use of the crossing, be liable to the charge of negligence if it did not have a flag-man while continuing such dangerous use. I think no one would pretend that if the bell should become muffled, or the whistle disabled, it would not be the plain duty of the company, especially if both of them would give no warning, to take some other and effective means to supply in some way, notice of the approach of the train to the crossing. The company would have no more right to

rush its train, without warning, at high speed across a crowded street, than the traveler upon the highway would to attempt a crossing without looking or listening for a train.

The court was right in saying, in substance, that it was the duty of the defendant to give due and timely warning of its coming, and the approaching danger,—

"Either by bell or whistle, or both, or by some other means, and in such a way as to give him an opportunity, by the exercise of due diligence and care, to meet and guard himself from danger."

The fact that he repeated this in a different way several times does not alter the doctrine, and is not a just cause of complaint. The fact is that the charge of the court in this case is unusually long, covering 20 closely printed pages of the record, and consequently the same proposition is repeated again and again; but the charge is nevertheless a very clear, fair, and able one. I do not think the jury were misled by it. What I have here written, as to the length and character of the charge, is in view of certain detached portions of the same, which have been made the subject of argument here, and error claimed thereon by the counsel for the defendant, and which I now proceed to examine.

In one part of his charge the circuit judge instructed the jury as follows:

"Manheimer when about to go upon the railroad track, was bound to recognize the danger, and to make use of his senses of hearing and sight, to ascertain before attempting the crossing whether a train was in dangerous proximity; and if he neglected to do this, but ventured blindly upon the track, it must be at his own risk, and your verdict in such case would have to be for the defendant. The failure of the engineer to sound the whistle or ring the bell, if such were the fact, did not relieve the deceased from the necessity of taking ordinary precautions for his own safety. Negligence on the part of the company's employes in those particulars was no excuse for negligence on his part; and, on the other hand, if Manheimer was negligent, that was no excuse for the company for its negligence, if it were negligent."

The counsel for the defendant claim error in the giving of the last clause above quoted. They say in their brief:

"This, though true as an abstract proposition, yet, given in the connection it was, its direct tendency was to mislead the jury."

I do not think it could have misled the jury. The court had repeated many times that it was the duty of Manheimer to look and listen for the train, and to take every ordinary precaution to escape a collision, and here says, as had been said in the charge once or twice before, that a failure to ring the bell or blow the whistle, or any other negligence upon the part of the defendant, would not authorize a recovery on the part of the plaintiff, if the deceased had failed to perform his duty in taking the precautions required of him by the law. It cannot be considered, in the face of this instruction, so many times clearly given and stated, that the jury were led to believe by the remark complained of that if the defendant was found to have been negligent the plaintiff could recover, notwithstanding the negligence of his intestate. The remark really had no place in the charge and might have been well and better omitted; but I cannot see how it could have occasioned any harm before a jury of any intelligence.

It is also claimed that the court erred in instructing the jury that if the train was late, and Manheimer did not know it, and no train was due on schedule time, he was required to use but *slight* care comparatively in looking out for the approach of a train. Upon the argument I was inclined to think that the charge in this respect was misleading, and might have led the jury, perhaps, to understand that Manheimer was excused from taking the usual and ordinary precautions of looking and listening to ascertain that the track was clear before attempting to cross, which is the duty at all times of persons approaching a railroad crossing. But on a careful examination I find that the circuit judge stated clearly enough to the jury at least a dozen times that, if Manheimer

did not look and listen for an approaching train before crossing the track, plaintiff could not recover because of his negligence; and also—

"That if there was no train due at the time, and none in hearing, or coming from either way, still it would be his duty to look and listen as he approached the track, because a railroad crossing is always considered to be a place more or less dangerous."

The charge complained of in this respect may be summed up in the following extract:

" But the degree of care and prudence which he would be required and expected to exercise under such circumstances, when no train was due and none was coming, would be comparatively slight; and so it might be if the train were some hours behind or off time, and was actually coming, but of the coming of which he did not know."

The whole effect of this reference to the amount of care, under such circumstances, would seem to be that Manheimer was required in any event, and under all circumstances, to look and listen for an approaching train, but he was not bound to look and listen as carefully as he would have been had a train been due, and the time of its coming been known to him. This is good law. The precaution that Manheimer was bound by the law to take was the care that an ordinarily prudent man would have exercised under like circumstances. The ordinarily prudent man looks and listens before he crosses a railroad track, but he does not look or watch as closely when he has reason to believe that no regular train is due or coming as he does when he knows that one may be expected at once at the crossing. I think the jury must have understood it in this sense. If so no error was committed.

I have been unable to find any hurtful error in the proceedings. The judgment of the court below should be affirmed, with costs.

The other Justices concurred.