EMERY *v.* CHESAPEAKE & OHIO RAILWAY COMPANY.

1. APPEAL AND ERROR—JUDGMENT NON OBSTANTE VEREDICTO—EVIDENCE.

A judgment for defendant *non obstante veredicto* is reviewed by the Supreme Court by examining the proofs in the light most favorable to plaintiff to determine whether there were any proofs upon which a jury properly could return a verdict for plaintiff.

2. RAILROADS—NEGLIGENCE—GRADE CROSSING—EVIDENCE.

Evidence presented in motorist's action against railroad for injuries received at nighttime grade crossing accident *held,* sufficient to submit to jury issue of defendant's compliance with its common-law duty of care and to support jury's finding that railroad had breached such duty and that such breach caused the injuries for which damages were sought.

3. SAME—AUTOMOBILES—CONTRIBUTORY NEGLIGENCE—EVIDENCE.

Issue of contributory negligence of motorist who was injured in nighttime railroad grade crossing accident *held,* to have been properly submitted to jury under evidence adduced.

4. SAME—INSANITY—STATUTE OF LIMITATIONS—EVIDENCE—INSTRUCTIONS.

Issue of insanity of plaintiff's ward by reason of injuries received in nighttime railroad grade crossing accident and as to whether or not insanity continued at least until within 3-year period preceding commencement of action *held,* properly submitted to jury under evidence adduced and under instruction prepared

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 5 Am Jur 2d, Appeal and Error §§ 608, 886.
[2, 5, 6, 9] 44 Am Jur, Railroads § 493.
[3] 44 Am Jur, Railroads § 529.
[4] 34 Am Jur, Limitation of Actions §§ 201–205.
[7, 8] 44 Am Jur, Railroads § 528.
Responsibility for accident at railroad crossing as affected by absence, improper location, or insufficiency of signs warning approaching travelers of presence of crossing. 93 ALR 218.
[10] 38 Am Jur, Negligence § 344.

(663)

almost verbatim from defendant's own request to charge (CLS 1956, § 609.13).

5. SAME—GRADE CROSSINGS—PROTECTION.

Railroads have a common-law duty to maintain such grade crossing protection to highway travelers, in addition to safeguards required by statute, as ordinary care and prudence demand.

6. SAME—GRADE CROSSING—PROTECTION A QUESTION FOR JURY.

The responsibility for determination of that which ordinary prudence requires in the protection of highway travelers over railroad crossings at grade is for the jury and is not a responsibility subject to a judge's determination of the presence of a factual condition precedent.

7. SAME—GRADE CROSSING—WARNING DEVICES—PROTECTION.

Issue of whether railroad had a duty to provide warning devices at gravel street crossing of its single main-line track in addition to the ordinary wooden crossbuck sign was properly submitted to jury in action arising from injuries received by plaintiff's ward, now insane, when he collided on a dark night with the 31st and 32d cars of a 56-car train lighted only at either end, where other witnesses testified it was difficult to see trains at that crossing at night, 4 other nighttime accidents had occurred recently, and public service commission's order requiring installation of flashing light signal had not yet been implemented.

8. SAME—GRADE CROSSING—ADDITIONAL PROTECTION.

Trial judge erred in granting defendant railroad company's motion for judgment *non obstante veredicto* in action arising from injuries received on a dark night by plaintiff's ward at city street grade crossing protected solely by an ordinary wooden crossbuck sign, because he concluded there was an absence of proof of unusual conditions at the crossing and that, therefore, as a matter of law defendant was under no obligation to maintain additional warning devices.

9. SAME—GRADE CROSSING—PROXIMATE CAUSE—EVIDENCE.

Evidence adduced in action arising from injuries received by plaintiff's ward in nighttime railroad grade crossing accident *held*, ample to support jury's verdict for plaintiff that the ward had collided with the mid part of the train because of inability to see it and was not sufficiently warned otherwise, because of defendant's negligence, of its presence in time to avoid it.

10. NEGLIGENCE—QUESTION FOR JURY.

It is for the trial court to say whether or not the evidence in an action for negligence is such that negligence of a defendant

*could be* inferred and, if so, then for the jury to say whether it *ought to be* inferred.

Appeal from Genesee; McGregor (Louis D.), J. Submitted November 5, 1963. (Calendar No. 49, Docket No. 49,800.) Decided May 4, 1964. Rehearing denied June 4, 1964.

Case by Marjorie L. Emery, guardian of Emerson H. Emery, incompetent, against Chesapeake & Ohio Railway Company, a foreign corporation, for personal injuries sustained in collision at a grade crossing. Judgment for defendant *non obstante veredicto.* Plaintiff appeals. Defendant cross-appeals. Reversed and remanded for entry of judgment on jury verdict.

*MacDonald & Ortlieb* (*Philip Elliott,* of counsel). for plaintiff.

*Robert A. Straub* (*Gault, Davison & Bowers,* of counsel), for defendant.

SOURIS, J. After jury verdict for $51,500 in plaintiff's favor in this negligence case, the trial judge granted defendant railroad judgment *non obstante veredicto.*. We review this judgment on plaintiff's appeal, as we would a granted motion for directed verdict of no cause, by examining the proofs in the light most favorable to plaintiff to determine whether there were any proofs based upon which a jury properly could return a verdict for plaintiff. *Barnebee* v. *Spence Brothers,* 367 Mich 46.

Decision in this appeal has required our consideration of the circumstances in which a jury must be allowed to determine performance or breach of a railroad's common-law duty of care at grade crossings. The trial judge initially submitted this issue

to the jury which found from the evidence that due care required more from the defendant railroad than its mere maintenance of warning devices required by statute; but the judge subsequently concluded in granting defendant judgment *non obstante veredicto* that, *as a matter of law,* the circumstances disclosed by the evidence did not require of defendant any greater care than mere compliance with statutory requirements. For reasons to be subsequently stated, it is our conclusion that the trial judge was correct initially in submitting the question of defendant's compliance with its common-law duty of care for factual determination by the jury and that the jury's finding that defendant had breached such duty was amply supported by the evidence.

Having concluded that the jury's finding that defendant had breached its duty of due care for the safety of Emerson Emery, plaintiff's mentally incompetent husband and ward, we were required next to determine whether there was evidence to support the jury's finding of causal connection between such negligence of defendant and Emery's injury. The plain fact is that, excepting only for Emery's own testimony (concerning which more will be said later) there was no eyewitness testimony from which it could be determined directly how the collision occurred. In view of the jury's verdict for plaintiff, its implicit finding of causal connection could only have been determined by the jury by rejection of at least part of Emery's own testimony and its favorable consideration of contrary circumstantial evidence,—thus requiring us to determine whether the jury's finding of causation was based upon permissible inferences from such evidence or upon nothing more than conjecture. We conclude that, taking a favorable-to-plaintiff view of the evidence, the jury was entitled reasonably to infer that defendant's.

negligence was a cause in fact of plaintiff's ward's injuries.

In addition to the foregoing issues we will discuss fully in this opinion, there are 2 other issues we may dispose of summarily. First, defendant on appeal urges that we find Emery to have been guilty of contributory negligence as a matter of law. We need not discuss at length our rejection of this contention. The contention is based squarely upon Emery's testimony that he stopped 15 or 20 feet in front of the defendant's tracks and, seeing and hearing nothing to warn him of danger, proceeded to cross the tracks and was struck by what he testified he thought was the defendant's engine.[1] Other evidence in the case, including the physical facts of box car damage and absence of any marks of collision on the engine, sharply contradicts this testimony and, at best, makes of the issue of contributory negligence one for jury determination rather than for determination by the trial judge or by us as a matter of law.

Second, by cross appeal defendant claims the statute of limitations, CLS 1956, § 609.13 (Stat Ann 1959 Cum Supp § 27.605),[2] bars this action and that Emery's mental incompetence did not toll the running of the limitational period within the meaning of CL 1948, § 609.15 (Stat Ann § 27.607).[3] There was ample evidence we need not describe from which the jury properly could find, as it evidently did, that

---

[1] Emery testified in this case notwithstanding his then current status as an adjudicated mental incompetent. The jury was instructed, properly, that it could take the fact of his adjudicated incompetence into account in evaluating his testimony. By its verdict for plaintiff, it is apparent the jury chose to disbelieve at least some of Emery's testimony.

[2] Now CLS 1961, § 600.5805 (Stat Ann 1962 Rev § 27A.5805).

[3] "If any person entitled to bring any of the actions mentioned in this chapter shall, at the time when the cause of action accrues, be within the age of 21 years, insane, or imprisoned in the State prison, such person may bring the action within the times in this chapter respectively limited, after the disability shall be removed."

Emery was rendered insane by his injuries and that he remained insane at least until within the 3-year period preceding commencement of this suit. The issue was a factual one dependent upon the jury's determination that Emery's mental derangement was such as to "bar the sufferer from comprehending rights he is otherwise bound to know," as was said in *Valisano* v. *Chicago & N. W. R. Co.*, 247 Mich 301, 304. It was so submitted to the jury by instruction which was prepared almost verbatim from defendant's own requests to charge. Nothing in this record would compel our reaching a factual conclusion on this issue different from that of the jury and certainly not as a matter of law.

We may turn now to the principal issues involved in this appeal: (1) Was the defendant railroad's performance or breach of its common-law duty of care a question of fact for jury determination? (2) Was the evidence sufficient to support the jury's finding of proximate causation?

1. The collision occurred in the city of Flint on Lippincott road, of gravel surface and 20 feet wide, where it is crossed by the single track main line of the defendant railroad. Emerson Emery, while driving his automobile eastward along Lippincott one dark night in May of 1952, collided with 1 of defendant's southbound freight trains then crossing the roadway, Emery's automobile striking the 31st and 32d cars of a 56-car train. The only lights on the train were on the engine, about 1/2 mile south of Lippincott road at the time of the collision, and on the caboose at the rear of the train. The only warning device at the grade crossing was a standard wooden crossbuck sign. Several witnesses testified, from their prior observations and from their experiences on the very night of the collision, that it was difficult to see trains crossing Lippincott

when cautiously approaching this grade crossing from west to east at night.

Two of the witnesses indicated by their testimony that the placement of an ordinary city street light just west of the defendant's tracks, the arc of which did not extend far enough to illuminate those tracks, and the darkness of the area immediately east of the tracks, made it difficult for eastbound motorists to see trains which were in the process of crossing Lippincott road. One of these witnesses testified as follows:

"*Q.* On the night of this occurrence was the street light shining?

"*A.* Yes.

"*Q.* What can you tell us as to what you saw, the effect of the street light?

"*A.* How is that?

"*Q.* What can you tell us about what you saw of the effect of the street light?

"*Mr. Davison:* For what position?

"*A.* From driving down—

"*Q.* (*By Mr. Ortlieb*): As you were approaching this crossing.

"*A.* Well, as I say, the arc of the light don't shine on to the railroad. * * *

"*A.* When you come into the light you cannot see through it, when you get to the light, you cannot see beyond the arc of the light.

"*Q.* This was the condition prevailing that night?

"*A.* That is right.

"*Q.* In other words this light shed an arc down on the highway?

"*A.* That is right.

"*Q.* You say it did not come to the track?

"*A.* No.

"*Q.* In other words, that shed an arc light, something like this (indicating)? .

"*A.* Yes, similar to that, yes.

"*Q.* You say that you could not see through it?

"*A.* No, you cannot see through this light at night, unless lights on the other side of it.

"*Q.* And what kind of a night was it, that night?

"*A.* Well, just an ordinary night, 10 o'clock, around 9:30, 10 o'clock, dark.

"*Q.* It was dark?

"*A.* Yes.

"*Q.* Were there any lights in the background, that is, to the east of the tracks?

"*A.* No.

"*Q.* It was all black?

"*A.* It was all black."

The foregoing testimony was confirmed by the opinion testimony of an expert witness, an associate professor of physics at the University of Michigan.[4] It was his testimony that an eastbound motorist's eyes adjust to the brilliance of the light arc cast by the street lamp, located as it was 140 to 150 feet west of the railroad grade crossing; that as the motorist passes through the arc of light and enters an area of relative darkness, his eyes do not adjust instantaneously to the difference in the levels of illumination; and that until such adjustment occurs his vision is impaired.

---

[4] The trial judge virtually struck the expert's testimony from the record by the following jury instruction:

"Dr. DeGraaf, an expert in problems of visibility, testified on behalf of the plaintiff. He gave a very interesting discourse on the subject of visibility as affected by an ordinary street lamp, but his testimony does not indicate that but for the street light Emerson Emory could have seen the train. His testimony did not establish the extent of Emerson Emery's visibility on the night of the accident, nor does it furnish any evidence of negligence on the part of the defendant, because there is no evidence that the defendant could have reasonably foreseen that the street light would have caused the condition as claimed by the plaintiff. There is no evidence that any agent or employee of the defendant railroad ever knew or heard tell of the theory that an ordinary light would become a hazard to an automobile passing under it. It is nearly always easy after an accident happens to see how it could have been avoided, but negligence is not a matter to be judged after its occurrence."

There were introduced in evidence records of the State public service commission concerning the railroad grade crossing involved in this case. From those records and from direct testimony it appears that the city of Flint, almost 2 years before Emery's injuries, had requested the commission to hold hearings for determining the advisability of installing flashing light signals at several grade crossings in the city, including the Chesapeake & Ohio Railway's main-line crossing on Lippincott. During a 6-month period prior to Emery's collision with defendant's train, from June to December of 1951, there were 5 accidents at this grade crossing. In each case the motor vehicle was traveling eastward, in the same direction Emery was traveling before he struck defendant's freight train. In at least 4 of the 5 other cases,[5] as in this case, the collision occurred during darkness. Ten days after the last of the series of 5 accidents, 1 of which was a fatality, representatives of the railroad, the city of Flint and the public service commission met at the site of the grade crossing where it was agreed that flashing light signals would provide the protection which was obviously needed. On February 8, 1952, about 3 months before Emery's accident, an order was entered by the public service commission reading, in its pertinent parts, as set forth in the margin.[6]

---

[5] In the fifth, the collision occurred at 7:12 a. m. on July 9th.

[6] "An inspection having been made on the premises, in question, by a representative of this commission, together with representatives of the railway and city, the commission is advised in the report of inspection that flashing-light signals are needed at this crossing due to the number of accidents occurring at this crossing in recent months and that the cost and expense of the signal installation be borne in accordance with the provisions of PA 1931, No 336 [amending PA 1921, No 270 (CL 1948 and CLS 1954, § 469.1 *et seq.* [Stat Ann and Stat Ann 1961 Cum Supp § 22.761 *et seq.*])].

"The commission is now in receipt of a letter, dated February 1, 1952, from the Chesapeake & Ohio Railway Company and signed by T. F. Burris, its chief engineer, wherein the commission is advised that the railway company is agreeable to the signal installation at said crossing, providing that the signals are installed, paid for, and

Unfortunately, the commission order did not require immediate installation of the flashing light signal but provided, instead, that it be installed within 9 months from the date of the order. Emery's accident occurred before the ordered signal was installed.

Plaintiff's claims that defendant was negligent in failing to install promptly the flashing light signal or some other warning device were rejected by the trial judge in his opinion granting defendant judgment *non obstante veredicto* on the ground, among others, that plaintiff had failed, as a matter of law, to prove any "unusual conditions" requiring the railroad to provide warnings in addition to the crossbuck sign. Reference was made in the opinion to *McParlan* v. *Grand Trunk W. R. Co.*, 273 Mich 527; *Esterline* v. *Kennicott*, 277 Mich 130; *Allen* v. *Grand*

thereafter maintained in accordance with the provisions of PA 1931, No 336.

"The commission, after due consideration of the application and letter of approval from the railway company, together with the report of inspection, finds and holds that the signal installation is necessary at said crossing and, therefore, the application should be granted.

"Therefore, it is hereby ordered by Michigan public service commission that the Chesapeake & Ohio Railway Company shall, not later than 9 months from the date of this order, install and effectively maintain and operate automatic track-circuit-operated flashing-light signals at the crossing of Lippincott boulevard with the tracks of the Chesapeake & Ohio Railway Company (Belt Line), located in the city of Flint, Michigan, provided:

"(1) That the installation of said signals be made in accordance with the requirements of PA 1931, No 336, and the plan and specifications of the Michigan public service commission, attached hereto and made a part hereof;

"(2) That the cost and expense of the signal installation, together with their future maintenance, be borne in accordance with the requirements of PA 1931, No 336.

"It is further ordered that, if at any time the flashing-light signals become inoperative or cease to work, the railroad company shall, as soon as possible, cause a watchman to be stationed at the crossing to warn of the approach of trains about to cross the highway until the flashing-light signal system has been restored to working order.

"It is further ordered that, after said flashing-light signals have been installed and placed in operation at said crossing, an affidavit shall be filed with this commission by an official of the railroad showing the date such signals were installed and placed in service."

*Trunk W. R. Co.*, 334 Mich 104, and *Walsh v. Grand Trunk W. R. Co.*, 363 Mich 522.

In those cases relied upon by the trial judge, recognition was given to what this Court recently, in *Walsh v. Grand Trunk W. R. Co., supra,* called an "exceptional rule." The rule, *as it is sometimes construed and applied,* is, indeed, so exceptional that railroads have been excused from compliance with the otherwise universally applicable common-law duty of due care,—of ordinary prudence,—the trial judge first having determined *as a matter of law* that there was no "special duty" (*McParlan,* p 534, and *Esterline,* p 133) imposed upon a defendant railroad to maintain "special warning" (*McParlan,* p 535) of danger caused by "special conditions" (*McParlan,* p 534, and *Esterline,* p 133), "unusual conditions" (*Allen,* p 107) or "special circumstances" (*Walsh,* p 524). The true rule has sometimes been thus misconstrued and misapplied. Hence, we shall give more than passing attention to the occasionally difficult application of the rule, rather than to the rule itself. In none of our opinions upholding directed verdicts of no cause or reversing jury verdicts for plaintiffs by our own invocation of this "exceptional rule" has our deviation in grade-crossing cases from the due care standard of the common law been announced but, on the contrary, as in *McParlan,* at p 533, we have asserted our continuing recognition of its applicability while refusing more often than not to apply it.

In *McParlan* this Court accurately restated our common-law rule that railroads have a duty to maintain such grade-crossing protection to highway travelers, in addition to safeguards required by statute, as ordinary care and prudence demand, pp 533, 534; however, the correct rule, "exceptional" or otherwise, having been clearly repeated, it seems to us that the Court in the specific circumstances shown

in *McParlan* erred in failing to apply it.[7] For presently contemporaneous restatement of the same rule, see *Baldinger* v. *Ann Arbor R. Co.*, 372 Mich 685. Unfortunately, some of the language of the Court's opinion in *McParlan* has been understood erroneously to mean, on the contrary, that only in the event of truly extraordinary circumstances of danger or risk does a railroad have any duty to maintain protective devices at grade crossings in addition to those required by statute and that *the trial judge* is obliged to determine the existence of such extraordinary circumstances before submitting to the jury the question of a railroad's compliance with such duty. That was not the rule in 1935 when *McParlan* was decided, as is evident not only from *McParlan's* statement of the rule but also from analysis of *Staal* v. *Grand Rapids & Ind. R. Co.*, 57 Mich 239; *Guggenheim* v. *Lake Shore & M. S. R. Co.*, 66 Mich 150; *Freeman* v. *Duluth S. S. & A. R. Co.*, 74 Mich 86 (3 LRA 594); and *Barnum* v. *Grand Trunk W. R. Co.*, 148 Mich 370, upon all of which the Court's opinion in *McParlan* expressly relied.

*Barnum* v. *Grand Trunk W. R. Co.* is in point. There, the Court approved a challenged jury instruction (quoted from the opinion in the margin[8]) that

---

[7] The rule fairly required, upon the facts and inferences adduced in *McParlan*, denial of Grand Trunk's motion for judgment *non obstante veredicto* rather than grant thereof.

[8] " 'You are instructed that you must not find defendant guilty of negligence from the mere fact that the locomotive was backing over Beach street crossing following the freight train. Safe railroading is often a matter of minutes, sometimes seconds, and it is not for juries or courts to determine what good or bad railroading requires from their own opinion, or from the fact that an accident has happened under certain conditions; but it is for you to determine, under all the circumstances, surroundings, and conditions as they existed at and near the crossing, the fact that the Pere Marquette Railroad was in close proximity, the fact that Saginaw street bridge was not in use for teams, the increase of travel, if any, over the Beach street crossing, and the amount of travel over the same, the fact that there were no flagman or gates at such crossing, the obstructions, if any, which may have obstructed the view of the track to the east of the crossing in respect to persons approaching the crossing from the

squarely put upon the defendant railroad, in classically simple language replete with helpful references to the evidence, the common-law duty of due care. The same is true of *Guggenheim* v. *Lake Shore & M. S. R. Co.* where this Court, in approving a trial judge's jury instruction, discussed the defendant railroad's duty in the following terms (pp 158, 159):

"The court instructed the jury, in these respects, that in running its trains over the crossings of public highways it is the duty of the railroad company—

" 'To exercise a degree of care and prudence commensurate with the danger and peril to which persons, who are seeking with due care and caution to cross the track, are liable to be exposed by its trains, so that they may have a reasonable opportunity, by the exercise of due care and prudence on their part, to save themselves from injury;—'

"And that if at the time of Manheimer's death the crossing was a dangerous one, and if, as he approached the track, his view was cut off or obstructed in a measure by intervening buildings and freight cars, so as to interfere with his seeing its approach or knowing of it until it was dangerously near, it was the duty of the defendant to give due and timely warning of the approaching danger, either by bell,

---

north, the passing of the freight train, the following of the backing engine, its speed, and the proximity to the train, whether or not the brakeman was on the tender in position to signal the engineer in case of danger to persons making Beach street crossing, and, under all the other facts in the case, whether the defendant railroad was exercising such ordinary and reasonable care and caution as ordinary prudence would dictate in running its engine and tender, backing the same, following the freight train that had just passed Beach street going in the same direction and on the same track. If you find that the defendant railroad was not exercising such ordinary and reasonable care and caution in its conduct as ordinary prudence would dictate, then I charge you that defendant railroad would be guilty of negligence, and plaintiff would be entitled to a judgment, if you find that such negligence of the railroad was the proximate cause of the injury, provided you further find that Mr. Nixon was exercising such ordinary and reasonable care and caution as an ordinarily prudent man would exercise under the same circumstances, surroundings, and conditions as you will find they appeared to him at that time.' "   148 Mich 370, at p 372.

whistle, or both, or by some other means, and in such a way as to give him an opportunity, by due diligence and care, to meet and guard against such danger; and that the absence of any statute requiring it would not, under such circumstances, relieve the railroad company from giving due and timely warning, by whistle or otherwise, of the approach and passage of its trains over a dangerous crossing of a public street; and that while there was, at the time of the accident, no statute limiting the speed of the train over this crossing, yet the speed of such train must nevertheless be consistent with the degree of care and prudence required in good railroad management, and that such crossing must be approached and passed over with the care and prudence commensurate with the rate of speed attained, and the train managed and controlled with that degree of care and prudence required for the safety of the lives and property of the persons rightfully approaching and traveling over such crossing.

"It needs no argument to demonstrate that the court was right in these propositions. It would be a queer doctrine to establish that a railroad company could do what it pleased with its train in running over a crossing like this, unless interdicted by some statute, without any regard to that common care and prudence that the law requires from all to protect the lives and property of others." 66 Mich 150, 158, 159.

Subsequently, (pp 160–163) in *Guggenheim,* it is true that this Court did speak of the railroad's duty to take "extra precaution" by giving "additional warnings" of "increased danger" caused by the railroad's leaving freight cars standing on a side track in such a way as to obstruct an approaching traveler's view and by its running its trains behind schedule. However, the jury charge it approved which related to these matters told the jury nothing more than that defendant was obliged to exercise increased diligence

and care commensurate with the increased dangers created by defendant's operation of its trains. Significantly, this Court did *not* refer to the standing freight cars or the operation of behind-schedule trains as "special conditions" absent which the trial court would not have been justified in submitting the issue of defendant's negligence to the jury. *Guggenheim* simply approved a jury charge which left for jury determination defendant's compliance with the common-law duty of due care commensurate with all of the circumstances.

In *Freeman* v. *Duluth S. S. & A. R. Co.,* 74 Mich 86, the plaintiff claimed the defendant railroad was negligent in failing to put a flagman at a grade crossing obstructed from the view of highway travelers. Although reversing a jury verdict for plaintiff, on the ground of contributory negligence, this Court approved a jury instruction imposing upon the railroad the common-law standard of duty which requires due jury regard of *all* the circumstances of the crossing. This Court spoke critically of that instruction in only 1 particular,—where it charged that in order to find that the railroad was required to place a flagman at the crossing the jury had to find:

"that the danger at the crossing was altogether exceptional,—that there was something about the case rendering ordinary care on the part of the witness Grant (the driver of the horse and carriage) an insufficient protection against injury, and therefore made the assumption of the burden of a flagman on the part of the railroad company a matter of common duty for the safety of people crossing." 74 Mich 91, 92.

That portion of the charge, said this Court at p 92, was too favorable to the appellant railroad

"in that it connected the necessity of keeping a flag-
man at this crossing with the use of ordinary care
on the part of Grant. The duty of maintaining a
flagman at this point did not depend on the question
whether Grant, in this particular instance, could by
common prudence have avoided this collision or not.
It depended rather upon the situation of the cross-
ing, its relation to the travel upon the street gener-
ally, and the facilities afforded, not only the travelers
on the street, but the trainmen on the cars, to avoid
collisions and accidents of this kind, without a flag-
man to give warning of approaching trains."

It is significant that the Court in *Freeman* rejected
reference to circumstances creating an exceptional
danger before the railroad could be found by a jury
to be duty-bound to provide a flagman, while reiter-
ating that the existence of the duty must be deter-
mined from *all* of the circumstances and the com-
mensurate requirements of common prudence.[9]

Finally we come to *Staal v. Grand Rapids & I. R.
Co.*, 57 Mich 239, sometimes also mistakenly relied
upon for the proposition that "special conditions"
must exist before railroads may be required at com-
mon law to maintain protective devices in addition
to those required by statute. Nothing in this Court's
opinion in *Staal* supports that proposition. Indeed,
the Court's opinion, written by Mr. Justice Camp-
bell, succinctly states the common law of this State
with reference to the obligation of railroads to pro-
vide protective devices at grade crossings above and
beyond those expressly required by statute. This
statement of the railroad's common-law duty is cast
in the usual terms of ordinary care and prudence

---

[9] *Freeman* and *Guggenheim* are discussed at length by the United
States supreme court in *Grand Trunk R. Co. v. Ives* (1892), 144 US
408, 422–427 (12 S Ct 679, 36 L ed 485), where that court applied
the common-law standard of due care in a Michigan grade-crossing
case without requiring a preliminary showing of "special circum-
stances."

determined from *all* of the circumstances, not just those which may be described judicially as constituting "special conditions," "unusual conditions," or "special circumstances." That portion of Judge CAMPBELL'S opinion in *Staal* bears repeating in the hope that its pointed repetition will help return this Court to the sounder precepts of an earlier day:

"The principal grievance, however, was, as claimed, the absence of any local warning. The duty of having gates or flagmen at a street crossing is not imposed absolutely at all city street crossings. But it cannot be held that circumstances may not impose a duty to do this or something which will be of service to passers-by. Under the charter of Grand Rapids it appears that the common council passed resolutions requiring the marshal to notify the proper officers of railroads to station flagmen at street crossings, and that this notice reached the defendant. The court below did not recognize this as imposing any legal duty, and we need not now consider how far it did so. But the jury were told that while there was no absolute duty laid on them by law, it was for them to decide whether ordinary care and prudence required some such precaution under the circumstances. In this we think there was no error.

"This was not a mere single crossing where the only danger was from cars running in 1 direction at a time, on a single and clear track, plainly visible. Within a small range 3 separate companies had tracks crossing this highway, and 1 of those companies had 3 tracks within 40 feet of defendant's. The immediate cause why the view was more or less obscured was the passing and repassing of a Michigan Central train between Staal and defendant's train, and the standing of cars upon a track near by. Defendant could not control the movements of other companies, and could not be controlled by them. This proximity made the running of all these cars, especially in opposite directions, more dangerous, as likely

not only to cut off view, but also to confuse the sound of passing trains. It cannot be said that companies that obstruct the ordinary travel on city streets may not be bound to make that obstruction as little dangerous as they reasonably can; and if from local surroundings such precautions as are sufficient generally are not sufficient there, it is open to inquiry how far they are culpable for mischief that can be traced to such neglect. We think the jury had enough before them to warrant them in considering these surroundings so dangerous as to call for some efficient local warning to passers-by." 57 Mich 243, 244.

*McParlan, Staal, Guggenheim, Freeman,* and *Barnum* should no longer be misconstrued as the sources of a truly exceptional and equally erroneous rule (nor should those cases be misapplied to reach a result) by which railroads are relieved of their common-law obligation to maintain such grade crossing safeguards as ordinary prudence requires upon judicial determination of the absence of "special circumstances." The decisions discussed above were true to the common law in recognizing that responsibility for determination of that which ordinary prudence requires is placed squarely and exclusively in our system of justice upon the jury and it is not a responsibility subject to a judge's determination of the presence of a factual condition precedent. Only in *McParlan* did the Court fail to apply that rule, while at the same time acknowledging its existence.

Turning now to this case of Emery and viewing it in the light of *Staal's, Guggenheim's, Freeman's, Barnum's* and *McParlan's* recognition of the common-law duty of ordinary care and prudence commensurate with *all* the circumstances,—relieved of the analysis-crippling semantics of "special conditions" and the like,—there can be no doubt that the

trial judge properly submitted for jury determination the question whether the physical circumstances existing at the grade crossing involved in this case required defendant railroad in the exercise of ordinary care and prudence commensurate with such circumstances to provide warning devices in addition to the ordinary wooden crossbuck sign.

The evidence of limited visibility at this grade crossing on the very night of Emery's collision with defendant's train from witnesses who preceded and followed him across that grade and their own graphic description of the artificially created lighting conditions there prevailing were the circumstances for jury consideration in determining whether the black and white crossbuck satisfied the common law's requirement of ordinary care and prudence. That at least 4 other nighttime eastbound drivers also collided with defendant's trains in such a short span of time preceding Emery's collision, would justify a jury conclusion that defendant railroad should have realized (as apparently it did), at least by the date of the public service commission's order, that additional warning signals were required. *Freed* v. *Simon,* 370 Mich 473, and 70 ALR2d 167. This issue was properly submitted to the jury by the trial judge and the jury's decision finds ample support in the evidentiary record. However, in subsequently setting aside that verdict at the time of his consideration of defendant's motion for judgment *non obstante veredicto,* the trial judge erred in his conclusion that, absent proof of "unusual conditions" at this crossing, as a matter of law defendant was under no obligation to maintain additional warning devices.

2. We have previously observed that the jury must have rejected at least some of Emery's testimony concerning the manner in which his collision with defendant's train occurred. There was no other direct evidence from which the jury could determine

how the accident happened except by consideration of circumstantial evidence. At this point in its deliberations, having found defendant to have been negligent in failing to provide adequate warning of danger, the jury's task was to determine whether there was a causal connection between defendant railroad's negligence and the collision between Emery's car and defendant's train. The evidence of limited visibility at this grade crossing on the very night of the collision; the testimony concerning the nearby street light's adverse effect upon the visibility to eastbound motorists of trains crossing Lippincott road, which testimony was amply corroborated by the expert witness' opinion testimony; and the remarkable record of 4 or 5 other previous nighttime collisions between defendant's trains and eastbound motorists in a 6-month period at this very crossing, presents an evidentiary record ample to support a jury's reasonable inference that Emery collided with defendant's freight train because he could not see it and was not warned otherwise of its presence in time to avoid it.

That was the only evidence in this case relevant to the issue of causation. It supports only 1 inference,—that defendant's negligence in failing to provide adequate warning of danger caused Emery's collision with defendant's train. No other inference can be drawn reasonably from that evidence and any other inference, therefore, would lack any support in this record, there being no other evidence, direct or circumstantial, from which the jury could infer that the collision occurred as the result of any other cause in fact.

Unlike *Walsh* v. *Grand Trunk W. R. Co.*, 363 Mich 522, there was legally sufficient evidentiary support in this record for the inference of causation the jury necessarily drew in rendering its verdict for plaintiff. It is for the court to say, as the trial

court did initially and as we do now, taking a favorable-to-plaintiff view of the evidence, of course, that the evidence is legally sufficient to support an inference of causation necessary to make defendant's negligence actionable.    The  ultimate  decision, whether such cause *ought* to be inferred, like all other fact questions, is for the jury.   See Lord Cairns' statement of this principle from *Metropolitan Ry. Co.* v. *Jackson,* 3 LR App Cases, 193, 197 (47 LJQB NS 303, 305, 37 LT 679), as quoted in *Carver* v. *Detroit & Saline Plank Road Co.,* 61 Mich 584, 592.[10]   See, also, *Parker* v. *Union Station Ass'n,* 155 Mich 72, 76, 77, and *Indiana Lumbermens Mutual Ins. Co.* v. *Matthew Stores, Inc.,* 349 Mich 441, at 449–452 (from concurring opinion).   The jury was not compelled to choose between one theory of causation and another, neither of which was supported by any evidence, in which event its decision would become an exercise in conjecture, as was the situation in the *Walsh Case;* nor, in this case, was it compelled to choose between 2 or more theories of causation all of which had some evidentiary support. It could only properly find as it did, that defendant's negligence was the cause of Emery's collision, or that it was not persuaded by the circumstantial evidence received that defendant's negligence was the cause.   See *Kaminski* v. *Grand Trunk W. R. Co.,* 347 Mich 417, particularly 425–428, and *Goldberg* v. *Koppy Tool & Die Co.,* 365 Mich 469, 472.   What was said in *Schoepper* v. *Hancock Chemical Co.,* 113 Mich 582, at 586, is squarely in point:

"Defendant's counsel contend that the cause of this explosion is a matter of mere conjecture, and it is

[10] " 'The judge has a certain duty to discharge, and the jurors have another and a different duty.   The judge has to say whether any facts have been established by evidence from which negligence *may be* reasonably inferred; the jurors have to say whether, from those facts, when submitted to them, negligence *ought to be* inferred.' "

said by counsel that it is not enough for plaintiff to prove circumstances consistent with her theory, but that these circumstances, and each of them, must preclude any other rational conclusion.   This we take to be but another way of stating the proposition that the proof must exclude all reasonable doubt. It is hardly necessary to say that no such rule obtains in civil cases.   It is true that where an injury occurs that cannot be accounted for, and where the occasion of it rests wholly in conjecture, the case may fail for want of proof.   *Robinson* v. *Charles Wright & Co.*, 94 Mich 283; *Redmond* v. *Delta Lumber Co.*, 96 Mich 545.   But such cases are rare, and that rule should never be so extended as to result in a failure of justice, or in denying an injured person a right of action where there is room for balancing the probabilities, and for drawing reasonable inferences better supported upon one side than the other.   In this case there was no direct proof of any other probable producing cause of the explosion than such as was offered by the plaintiff."

Having concluded that the evidentiary record was legally sufficient to support the jury's verdict for plaintiff—that the jury properly could find that defendant was actionably negligent—we conclude that it was error for the trial court to set aside such verdict in granting defendant's motion for judgment *non obstante veredicto.*

Reversed and remanded for entry of judgment on the jury's verdict.   Costs to plaintiff.

KAVANAGH, C. J., and DETHMERS, BLACK, SMITH, and O'HARA, JJ., concurred with SOURIS, J.

KELLY, J., concurred in result.

ADAMS, J., took no part in the decision of this case.